628 So.2d 1116 (1993)
STATE of Louisiana
v.
Hypolite FORET.
No. 93-K-0246.
Supreme Court of Louisiana.
November 30, 1993.
Concurring Opinion December 7, 1993.
*1117 Christopher J. Boudreaux, Boudreaux & LaRose, Thibodaux, for applicant.
Richard P. Ieyoub, Atty. Gen., New Orleans, Walter Naquin, Jr., Dist. Atty., Camille A. Morvant, II, Peltier & Morvant, Thibodaux, for respondent.
Concurring Opinion of Justice Lemmon December 7, 1993.
HALL, Justice.[1]
On October 11, 1991, a jury found Hypolite Foret, who was charged with molestation of a juvenile when the offender has control or supervision over the juvenile, guilty of attempted molestation of a juvenile (when the offender does not have control or supervision over the juvenile), a violation of LSA-R.S. 14:81.2 and LSA-R.S. 14:27. The trial court sentenced him to serve a term of three years imprisonment at hard labor. Foret appealed on several grounds, all of which were rejected by the court of appeal. The conviction *1118 was affirmed, with the sentence amended to give credit for time served. State v. Foret, 612 So.2d 1070 (La.App. 1st Cir.1992) (unpublished).
Chief amongst defendant's claims was that the trial court erred in allowing, over objection, a psychologist who had examined the victim to testify, as his report, which had been in the State's possession for over a week, was only made available to the defendant on the morning of trial. The court of appeal held that the defendant failed to make the requisite showing of prejudice as a result of the delinquent disclosure of the report and, consequently, refused to grant the defendant any relief.
Defendant applied for writs of certiorari to this court, which were granted. 620 So.2d 821 (La.1993). Upon review, this court reverses the court of appeal in its holding that the tardy delivery of the psychologist's report was not prejudicial, especially given the questionable scientific basis and highly influential nature of his testimony. As this alone is grounds for reversal of the conviction and a remand for a new trial, we will pretermit consideration of the other assignments of error.

I.
The defendant, Hypolite Foret, was convicted of attempting to molest his step-daughter over a one-and-a-half to two-year period, when the victim was twelve to fourteen years old. The victim testified that the repeated incidences of abuse took place at the family residence when her mother was asleep or not at home. The alleged initial acts of molestation involved hugging, kissing, and rubbing the victim's breasts, culminating with the defendant rubbing under the victim's clothes and inserting his finger into her vagina.
These alleged acts of abuse were discovered upon the return of the victim after she ran away from the family home. The victim had been having problems with both the defendant and her mother, namely that they were strict and steadfastly refused to allow her to date an older (by approximately eight years) boyfriend. Upon her return home, she was interviewed by a child protection worker, Cindy Ordoyne, and, during that interview, she detailed molestations allegedly made by her stepfather. The interview set forth a series of events that resulted in the court-ordered removal of the victim from the family home and the defendant being charged with molestation of a juvenile.
At trial, the defendant denied that he had abused the victim, but believed that she might have been abused by someone else. He admitted that he may have touched the victim's private parts, but maintained that the touching occurred accidentally during horseplay or tickling. The victim's mother, siblings, and a family friend all testified that they had never seen any indication that the victim was molested by the defendant. They also testified that the victim had said many times that she wanted to get out of the house, which the victim denied ever saying. The victim also admitted that she told her mother, after her removal from the home, that "I want to come home now. I think I'm going to tell the D.A. and the judge that I lied about everything." She also claimed that these statements were made solely to comfort her mother.
The state offered two expert witnesses to support its case-in-chief. The first was a physician qualified as an expert in the field of family medicine, who testified that, although an examination of the victim after the abuse was reported yielded no positive physical evidence of abuse, the lack of positive physical evidence of abuse was not unusual in this type of case. The second witness was a child psychologist, Dr. William Janzen, Ph.D., who was qualified as an expert in the field of psychology with expertise in child sexual abuse. Defendant objected to Dr. Janzen being allowed to testify, claiming that his not being given Dr. Janzen's report until the morning of trial when the state had possessed it for a week prior to trial was a prejudicial discovery violation, as there was insufficient time to prepare an effective *1119 cross-examination of the expert. This objection was overruled.[2]
Dr. Janzen testified that he interviewed the victim on three separate occasions and concluded that, in his expert opinion, she was telling the truth about being the victim of sexual abuse. He based his conclusions on the following: the victim gave detailed accounts of the acts of abuse and conversations she had with the defendant; the victim described common feelings of disgust and sadness; the victim claimed that the defendant was possessive of her and did not want her to be with other boys; the victim felt that she had done something wrong; and, finally, the defendant told her to keep the molestations a secret.
Dr. Janzen explained his methods for evaluation of sexual abuse allegations, focusing on questioning the victim:
And then on the basis of what I get from the child, the type of detail that I get from the child to make some conclusions about whether or not what she is telling me suggests that she has been sexually abused, or another way of putting it, on the basis of what I get from the child I make some conclusions about whether or not what she is telling me is consistent with what we know about the dynamics of sexual abuse.
He stated that, in this case, he gave the victim some emotional tests, but added that such tests "do not tell me anything about the allegations." The doctor observed that the victim's manner was "flat" and that she had "some sadness and unhappiness." Without regard to his previous caveat that these tests could not indicate sexual abuse, Dr. Janzen opined that her "attempts to hide her sadness" were caused by "embarass[ment] about the entire situation and she really prefers for people not to know about this."
He then went into specific details of the allegations made by the victim and, with the court's permission, named the defendant as the person whom the victim identified as her abuser. Dr. Janzen described the progression from touching on the outside of the victim's clothes to eventual fondling under the clothes. He then observed that "[t]his kind of progression is one thing that we look for in cases of sexual abuse." He further noted (in what is referred to as the "progressive" dynamic) that
many perpetrators will begin the sexual abuse process by doing casual things at first, sometimes making things appear to be an accident and then progress to more involved kind of activity such as placing their finger in the girl's vagina.
He next went into what he called the "secrecy" dynamic, "that is being told not to tell someone", to wit, her mother. He followed this by a description of the "jealousy" dynamic, whereby the unabusing spouse becomes jealous of the attention the abusing spouse is giving the abused child.
Finally, he noted the "recantation" dynamic. According to Dr. Janzen, children become concerned about the effect they are having on the family and begin to regret having revealed the abuse because they have been removed from the family and because they realize that a family member may be sentenced to prison. The victim "seemed to be very distressed about what was happening to her mother," and "was upset about being in foster care and missed her mother, and so in those kinds of cases they feel very guilty and they may recant." The doctor proffered that even if a child has been sexually abused by a parent, that child can still "love" that person.
The State then posed the following question:

*1120 Doctor, after the interviews you had with [the victim], the testing and the conversations and so on that you had with her, is it your opinion that she was sexually abused?
The defendant objected, claiming that the State was asking the expert to comment upon "the fact and [sic] issue here", but the trial court allowed the question to be answered, simply cautioning the doctor not to "identi[fy] ... any person who may be responsible." Dr. Janzen then answered:
The details that she gave me are consistent with the dynamics of sexual abuse and so my conclusion would, therefore, be that she has been sexually abused and should be in counseling to help her cope with that.
Later summing up his direct examination, Dr. Janzen noted that, given the details related to him by the victim and considering the various dynamics of sexual abuse, his "only conclusion" was that the victim had "been sexually abused."
Based largely on the testimony of the victim, as bolstered by Dr. Janzen, the jury returned a verdict of guilty of attempted molestation.

II.
Prior to trial, defendant moved for discovery of all reports of examinations and tests that were made by the State, pursuant to La.C.Cr.P. art. 719:
Upon motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy ... any results or reports ... of physical or mental examination, and of scientific tests or experiments, made in connection with or material to the particular case, that are in the possession, custody, control, or knowledge of the district attorney and intended for use at trial.
This duty to disclose is a continuing one, requiring the district attorney, if he discovers or obtains evidence prior to or during trial, to "promptly notify the other party and the court of the existence of the additional evidence." La.C.Cr.P. art. 729.3. A failure to comply with this duty can result in sanctions ranging from the granting of a continuance to prohibition of introduction of the non-disclosed subject matter. La.C.Cr.P. art. 729.5.
The court of appeal noted that, as the expert had reviewed a copy of his report prior to trial, the report was effectively "intended for use at trial." The phrase "intended for use at trial" has been given a broad meaning by this court, with a requirement that "reports [such as this one] be disclosed if related to the witness' testimony at trial." State v. Lingle, 461 So.2d 1046, 1049 (La. 1985). Thus, the report was discoverable, and the issues are whether or not it was promptly delivered and whether or not, if the delivery was not prompt, the tardiness prejudiced the defendant to an appreciable degree.
The report in question was dated September 29, 1991, and was mailed to the State on October 2, 1991. The appellate court determined that at the earliest, the state would have received the report the day after it was mailed, and, thus, had the report for seven days before giving it to defendant on the morning of trial. Although the report was not promptly given to the defendant, the appellate court was unwilling to find reversible error for the violation in the absence of a showing of actual prejudice to the defendant.
The court of appeal focused on prejudice arising from the defendant's inability to proffer his own expert to rebut Dr. Janzen. It held that the failure of the defendant to make a specific showing as to how another expert would have been able to attack the findings of the psychologist was fatal. The court of appeal failed, however, to focus on the inherent prejudice of the last minute disclosure in precluding adequate time to prepare to rebut the expert's testimony either by effective cross-examination or by offering the testimony of a defense expert. Perhaps more importantly, the court of appeal failed to consider whether this type of expert testimony was itself properly admitted into evidence, considering the significant *1121 problems that this type of testimony has created in other jurisdictions as recognized by reservations expressed by the concurring Justices in State v. Brossette, 599 So.2d 1092 (La.1992) (Dennis and Hall, JJ., concurring):
... the introduction of expert opinion testimony as to the psychological characteristics of the victim or her testimony is fraught with serious res nova constitutional and evidentiary problems. While this type of evidence is absolutely not admissible for some purposes ... but might be admissible for others, it should be allowed only after careful study and under strict control by the trial court....
The reluctance to embrace this kind of testimony was brought on by a fear of prejudice resulting from potential inaccuracy and the undue persuasive value of the very evidence itself, as opposed to whether or not it was properly rebutted. This prejudicial effect might have been avoided if the trial court carefully weighed and controlled this testimony. In this case, however, the tardy disclosure of the report deprived not only the defendant, but also the trial court of the opportunity for "careful study" of the matter so as to limit the expert testimony to the areas in which courts have generally agreed that the probative value of a child sexual abuse profile outweighs its potential for prejudice. In an effort to guide trial courts in the future, we shall explore what commentators and other jurisdictions consider to be the proper, non-prejudicial use of such expert testimony. This necessarily requires us to set out the general guidelines for the admissibility of expert testimony, as well as setting forth guidelines for admission of this particular kind of expert testimony.[3]

III.
La.C.E. art. 702 sets forth the general rule for the admissibility of expert testimony in Louisiana:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
As this provision is virtually identical to its source provision in the Federal Rules of Evidence, F.R.E. 702[4] and in several states' evidentiary rules, we will examine and consider federal jurisprudence and other states' jurisprudence interpreting the proper application of this rule.
"Subsumed in the requirements of Rule 702 is the premise that expert testimony must be reliable to be admissible." State v. Cressey, 628 A.2d 696, 698 (N.H.1993). A recent United States Supreme Court case, Daubert v. Merrell Dow Pharmaceuticals, Inc., ___ U.S. ___, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), set forth a means for determining reliability of expert scientific testimony and answered many questions as to proper standards for admissibility of expert testimony.
In Daubert, the court was concerned with determining the admissibility of new techniques as basis for expert scientific testimony. Formerly, the test for admissibility of expert scientific testimony was based on a "short, citation-free 1928 decision" of the District of Columbia Court of Appeals, Frye v. United States, 54 App.D.C. 46, 293 F. 1013 *1122 (1923). In Frye, the rule for admissibility of expert testimony was delineated as requiring "general acceptance" of a technique in its respective scientific field before the technique is considered admissible. 54 App.D.C. at 47, 293 F. at 1014. Finding that "a rigid `general acceptance' requirement would be at odds with `the liberal thrust of the Federal Rules'," the Court concluded that Frye's "austere standard, absent from and incompatible with [this liberal thrust] should not be applied in federal trials." ___ U.S. at ___, 113 S.Ct. at 2794 (citations omitted).
The court replaced Frye with a new standard that requires the trial court to act in a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. This requirement stems from a belief that the rules on expert testimony serve to relax "the usual requirement of first-hand knowledge" to ensure reliability on the part of a witness. ___ U.S. at ___, 113 S.Ct. at 2796. This relaxation is justified so long as "the expert's opinion (has) a reliable basis in the knowledge and experience of his discipline." Id.
The reliability of expert testimony is to be ensured by a requirement that there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. This connection is to be examined in light of "a preliminary assessment" by the trial court "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." Id. The court went on to make some suggestions as to how a court could fulfill its gatekeeping role. These involve whether or not the technique had been subjected to peer review and/or publication, the "known or potential rate of error", the existence of "standards controlling the technique's operation", the technique's "refutability" or, more simply put, testability, and, finally, an incorporation of the Frye general acceptance in the scientific community as only a factor in the analysis. ___ U.S. at ___, 113 S.Ct. at 2797.
The court also stated that other rules of evidence govern this testimony, mainly F.R.E. 403's balancing test that will exclude probative evidence if outweighed by its potential for unfair prejudice.[5] The Court noted the possibility that the expert's testimony can be quite misleading and prejudicial if this gatekeeping role is not properly satisfied, requiring a flexible approach and a careful evaluation of the methodology surrounding the testimony and its conclusions:
Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgmentoften of great consequence about a particular set of events in the past. We recognize that in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.
Id., ___ U.S. at ___, 113 S.Ct. at 2798.
Since much of the Louisiana Code of Evidence is patterned after the Federal Rules of Evidence in an attempt to facilitate a "movement towards a uniform national law of evidence", it seems appropriate for Louisiana courts to, "especially where the language of the Louisiana Code is identical or virtually identical with that used ... in the federal rules" utilize this "body of persuasive authority which may be instructive in interpreting the Louisiana Code." La.C.E. art. 102, Comment *1123 "a". As the Louisiana Code of Evidence provision on expert testimony is identical to the federal Rule, it follows that this court should carefully consider the Daubert decision that soundly interprets an identical provision in the federal law of evidence.
Past decisions of this court have espoused similar sentiments regarding the admission of expert scientific testimony. In State v. Catanese, 368 So.2d 975 (La.1979), this court rejected Frye's "general acceptance" in the scientific community as the only test for the admissibility of polygraph results in criminal trials. This court held that, although the validity of polygraph evidence was not "universally accepted" in the scientific community, the evidence should be admissible in a limited fashion in post-trial proceedings. Id., at 981-82. This court noted that such scientific evidence should be admitted in those proceedings whenever the trial court, after balancing the probative value of the evidence against its prejudicial effect, determines that "the evidence is reliable and will aid in a decision." Id., at 978-79, 983. The admission of the evidence was subject to the "discretion of the trial judge." Id., at 983.
Like Catanese, Daubert refuses to precondition admissibility of expert scientific testimony solely upon its "general acceptance" in the scientific community, and is also similar to Catanese in its reliance upon the evidence's admissibility provided that the trial court properly exercise its gatekeeping function in balancing the probative value of the evidence against its prejudicial effect.[6]Daubert goes further than Catanese in that it sets forth clearer guidelines as to how a trial court can determine the reliability of expert testimony in its consideration of the probative value aspect of the Catanese balancing test. The above-noted similarity between the federal and Louisiana rules on the admission of expert testimony, coupled with similar guidelines for the admissibility of expert scientific testimony pronounced by this court in Catanese, persuade this court to adopt Daubert's requirement that expert scientific testimony must rise to a threshold level of reliability in order to be admissible under La.C.E. art. 702. As we find the Daubert court's "observations" on what will help to determine this threshold level of reliability to be an effective guide, we shall adopt these "observations", as well.
It is not lost upon us that this new standard serves to remove some of the barriers in the admission of expert testimony in many fields, including child sexual abuse cases. Nevertheless, Dr. Janzen's testimony[7] still fails to satisfy the requirements for admissibility, even under the new Daubert standard. The reasons for this failure are several, and will now be discussed.

IV.
At the outset, we note that the tardy submission of the report prevented the trial court from exercising its gatekeeping function of determining whether or not the psychologist's opinion accorded with "the knowledge and skill of his discipline". The record is silent regarding any efforts by the trial court to determine, via some sort of evidentiary hearing, whether or not the psychologist's confidence in his ability to diagnose sexual abuse (based on the "dynamics" system known in the field as the Child Sexual Abuse Accommodation Syndrome) was well-founded.[8] Of course, this case was tried *1124 before the Daubert decision was handed down and defense counsel's objection was somewhat less than forcefully articulated and presented. If the trial court had conducted a hearing, it might have discovered the misgivings many experts and courts alike have with this type of testimony that utilizes the Child Sexual Abuse Accommodation Syndrome (and its progeny) as a basis for determining whether or not abuse has indeed occurred.
Child Sexual Abuse Accommodation Syndrome ("CSAAS") is a psychological phenomenon prevalent amongst victims of child sexual abuse. It was posited by Dr. Roland C. Summit in the late 1970s and early 1980s, and was a listing of the factors that were "both most characteristic of child sexual abuse and most provocative of rejection in the prevailing adult methodology about legitimate victims." Summit, "Abuse of the Child Sexual Abuse Accommodation Syndrome", 1 Journal of Child Sexual Abuse 153, 154 (1992). The factors were listed so as to both describe "the luxury of the adult world not to listen and the accommodating efforts of the child not to complain." Id. The principal factors (or "dynamics") include secrecy, helplessness, entrapment and accommodation, delayed/conflicted/ and/or unconvincing disclosure, and retraction. Id. The stated purpose in the dissemination of information relating to this "syndrome" was to create a "common language" for treaters of abused children. Summit, "The Child Sexual Abuse Accommodation Syndrome", 7 Child Abuse & Neglect 177, 191 (1983).
Despite this stated purpose, the "syndrome" came to be used as a tool for determining whether or not abuse has occurred, as opposed to the intended use of the "syndrome" as a treatment device:
Some professionals conflated the reactions described by Summit, which are not probative of abuse, with behaviors that are probative of abuse. This combination of behaviors was then denominated a syndrome, the presence of which was supposedly probative of abuse. The defect of this "syndrome" is that some of its components are probative of abuse and others are not. Opinions based on such a "syndrome" are of dubious reliability.
Myers, Bays, Becker, Berliner, Corwin, and Saywitz, "Expert Testimony in Child Sexual Abuse Litigation", 68 Neb.L.R. 1, 68-69 (1989). Commentators seized upon this as an "abuse" of the "syndrome":
Summit did not intend the accommodation syndrome as a diagnostic device. Rather, it assumes the presence of abuse, and explains the child's reactions to it. Thus, child abuse accommodation syndrome is not the sexual abuse analogue of battered child syndrome, which is diagnostic of physical abuse. Thus, battered child syndrome is probative of physical abuse. With child sexual abuse accommodation syndrome, by contrast, one reasons from the presence of sexual abuse to reactions to sexual abuse. Thus, the accommodation syndrome is not probative of abuse.
Myers, et al., at 67. This reluctance to embrace such a technique as a diagnostic tool also stems from the fact that CSAAS is, itself, based upon a "summary of diverse clinical consulting experience", making it a "clinical opinion, not a scientific instrument." Summit, "Abuse of the Child Sexual Abuse Accommodation Syndrome", at 156 (hereinafter referred to as "Abuse").
This reluctance has not been shared by certain elements of the legal community, who "have tended to seize upon CSAAS as a major weapon." "Abuse", at 156. Prosecutors could use it to bolster witness' credibility, and defense attorneys were frightened because of the threat that CSAAS posed to "traditional defense arguments that legitimate victims would fight back and complain, that any good mother would know if her child was a victim, and that retractions confirm the common sense assurance that children typically lie about sexual victimization." Id. The prevalent use of CSAAS in courtrooms *1125 has been, according to many clinicians, an improper one.
The "syndrome's" "discoverer" has stated that
CSAAS is meaningless in court discussion unless there has been a disputed disclosure, and in that instance the ultimate issue of truth is the sole responsibility of the trier of fact. The CSAAS acknowledges that there is no clinical method available to distinguish "valid" claims from those that should be treated as fantasy or deception, and it gives no guidelines for discrimination.
"Abuse", at 160. Instead, "[t]he CSAAS is used appropriately in court testimony not to prove a child was molested but to rebut the myths which prejudice endorsement of delayed or inconsistent disclosure." Id. In this opinion he is joined by commentators who take issue with the use of CSAAS as a diagnostic tool to show to a court that sexual abuse has indeed occurred:
The accommodation syndrome has a place in the courtroom. The syndrome helps explain why many sexually abused children delay reporting their abuse, and why many children recant allegations of abuse and deny that anything occurred. If the use of the syndrome is confined to these rehabilitative functions, the confusion clears, and the accommodation syndrome serves a useful function.
Myers, at 68.
In the instant case, Dr. Janzen used the "dynamics" of the syndrome not as a "common language" to facilitate treatment of the disorder as Dr. Summit and other therapists in the field intended, but as a tool for diagnosing whether or not abuse had occurred.[9] This use of CSAAS is seen as having highly dubious value by many members of the psychological treatment community, since "(g)enerally speaking, the psychological evaluation of a child suspected of being sexually abused is, at best, an inexact science." State v. Cressey, 628 A.2d at 699. Even experts utilizing CSAAS for determinations of the existence of abuse have been compelled to admit that "the evaluation of such a (sexually abused) child is partly a science and partly an art form." Id. Thus, the use of this technique for determinations of the victim's truthfulness in his or her allegations of abuse is not one that, even after peer review, has been embraced by the scientific community. Due to this failure, use of CSAAS-like techniques for determinations of the existence of abuse fails to satisfy the Frye element ("general acceptance" in the community) of the Daubert test.
This type of testimony also suffers from a number of difficulties inherent with all types of psychodynamic psychology. It is essentially "irrefutable", as the only way to test it is by proposing theoretical explanations for behavior and then testing the theories upon patients. See Morse, "Failed Explanations and Criminal Responsibility: Experts and the Unconscious", 68 Va.L.R. 971, 995 (1982). Regardless of opinions on the accuracy of psychodynamic theories such as the one at bar, we must agree with Professor Morse's conclusion that psychodynamic theories on the explanation of human behavior is, at best, a science that is difficult to impossible to test for accuracy. This untestability comes from its very nature as an opinion as to the causes of human behavior, and the fact that the methods for testing the results of psychoanalysis are rife with the potential for inaccuracy. Thus, the "key question" of testability in determining whether a technique is valid enough for admissibility cannot be conclusively answered. ___ U.S. at ___, 113 S.Ct. at 2796.
Finally, we must examine the "known or potential rate of error." ___ U.S. at ___, 113 S.Ct. at 2797. One of the few sources for validation of expert determinations of the *1126 existence of child sexual abuse is found in a study conducted that examined over 100 cases of child sexual abuse where the perpetrators confessed or acknowledged the abuse. Faller, "Criteria for Judging the Credibility of Children's Statements About Their Sexual Abuse", 67 Child Welfare 389 (1988), cited in Myers, supra, at 75-76. Faller described three factors that were crucial in determinations of abuse. They were "information about the context of the sexual abuse, the description or demonstration of the sexual victimization, and the victim's emotional state." Faller, at 391. The factors relied upon by clinicians in their determinations were prevalent in 68% of the cases, leading Faller to the conclusion that "clinical criteria employed by evaluators of sexually abused children are indeed valid predictors of whether children have been sexually abused...." Id., at 396-98.
While Dr. Faller might have been content with a 32% margin of error, we are not so comfortable, especially remembering that "[t]he integrity of the criminal trial process is too important to permit it to be compromised by the admission of dynamic speculations." Morse, at 1017. This type of testimony has been labeled as "so inherently unreliable that they cannot aid decisionmaking in the criminal justice system." Morse, supra, at 1026. In Rimmasch, supra, the court noted that
... the child abuse profile [CSAAS] consists of a long list of vague and sometimes conflicting psychological characteristics that are relied upon to establish the fact of injury in a specific case as well as the cause. And neither the record nor our independent research demonstrates that there is a general acceptance of [CSAAS] as a determinant of abuse either by the legal community ... or by the scientific community.
775 P.2d at 401.
The controversial nature of this evidence is only exacerbated by the existence of other studies that suggest that evidence based on psychodynamic formulations are unreliable. See Morse, supra, at 1022.[10] This unreliability contributes to the "inefficient, misleading, and prejudicial" nature of this testimony. Morse, at 1043. Psychodynamic formulations such as the one at bar have been criticized as "post hoc interpretive rationalizations of behavior, not explanations of it." Id.[11]
Apparently, "there is a lack of consensus about the ability of (CSAAS) to determine abuse (and) the scientific literature raises serious doubts as to the reliability of (CSAAS) testimony when used for forensic purposes to demonstrate that abuse actually *1127 occurred." State v. Rimmasch, 775 P.2d 388, 401 (Utah 1989). Criticisms include the varying reactions children have to abuse and the fact that behavior often attributed to abuse is sometimes the result of other emotional problems that do not stem from abuse. See McCord, "Expert Psychological Testimony About Child Complaints in Sexual Abuse Prosecutions: A Foray Into the Admissibility of Novel Scientific Evidence", 77 J.Crim.L. & Criminology 1, 23 (1986). In short, it is unclear at best whether CSAAS can be relied upon in any fashion. Given these questions about the reliability of this sort of testimony at all[12], it is only logical that this court should be reluctant to allow it to be broadly used for a purpose which it was not intendeda credibility evaluation tool.
Therefore, this court finds that this type of evidence is of highly questionable scientific validity, and fails to unequivocally pass the Daubert threshold test of scientific reliability. In any capacity, it is highly unlikely that it will be useful to a jury on the issue of a witness' credibility, especially as a tool for determining whether or not abuse actually occurred. Even if it were, the trial court made no such finding, and, by failing to exercise its "gatekeeping" role per Daubert, failed to satisfy what this court believes is a prudent and necessary standard for evaluation of expert testimony in criminal cases. Even assuming, arguendo, that CSAAS-based testimony itself does indeed pass the Daubert test for scientific validity, we now explore whether or not its use to bolster the victim's credibility was improper so as to unfairly prejudice the defendant.

V.
La.C.E. art. 702 sets up a scheme wherein the expert testifies only as to matters that are calculated to be helpful to the jury. Of course, this helpfulness to the jury is to be balanced by a due consideration of the probative value/prejudicial effect balancing test mandated by La.C.E. art. 403. As this provision generally follows the federal rule and is similar to other state evidentiary rules on testimony as to credibility, we look once again to federal and other state jurisprudence on this matter.
The question of whether or not such testimony on CSAAS is "helpful" to the jury in its determination of a victim's credibility has been one that, although it has generated much litigation in other jurisdictions, is res nova in this state. These other jurisdictions have repeatedly wrestled with the problem of admissibility of CSAAS-based testimony for the purpose of bolstering a victim's credibility, and they almost uniformly hold that the testimony is inadmissible:
[u]nlike some aspects of expert testimony on child sexual abuse, courts approach unanimity when it comes to expert testimony on credibility. The great majority of courts reject expert testimony which comments directly on the credibility of individual children or on the credibility of sexually abused children as a class.
Myers, at 121-122. The rationales for excluding the evidence all seem to focus on the factfinding role of juries and that part of this role involves a determination as to the credibility of each witness. Testimony by an expert is not particularly helpful to a jury that must rely upon its own common sense as a barometer for the evaluation of truthfulness. The cases all seem to focus on, in the face of such expert testimony, fears of
the jury surrender[ing] its own common sense in weighing [victim] testimony and deferr[ing] to [a] diagnosis [of sexual abuse] without knowing that the diagnosis was nothing more than a subjective opinion favoring [the victim].
United States v. Whitted, 994 F.2d 444, 447 (8th Cir.1993).
One of the early cases on this matter that has been repeatedly followed is United States v. Azure, 801 F.2d 336 (8th Cir.1986). There, the court held that a pediatrician's *1128 comment on whether or not the victim was indeed telling the truth about being the victim of sexual abuse was held to be reversible error:
Credibility, however, is for the jurythe jury is the lie detector in the courtroom... It is now suggested that psychiatrists and psychologists have more [expertise in weighing the veracity of a witness] than either judges or juries, and that their opinions can be of value to both judges and juries in determining [credibility]. Perhaps. The effect of receiving such testimony, however, may be twofold: first, it may cause juries to surrender their own common sense in weighing testimony; second, it may produce a trial within a trial on what is a collateral but still an important matter.
801 F.2d at 340, citing United States v. Barnard, 490 F.2d 907, 912 (9th Cir.1973).
Other jurisdictions agree with this reasoning on the subject of expert testimony on abuse victims' credibility. In Commonwealth v. Seese, 512 Pa. 439, 517 A.2d 920, 922 (1986), the Pennsylvania Supreme Court noted that this type of expert testimony was "an encroachment upon the province of the jury"; the court emphatically stated that
to permit expert testimony for the purpose of determining the credibility of a witness would be an invitation for the trier of fact to abdicate its responsibility to ascertain the facts relying upon the questionable premise that the expert is in a better position to make such a judgment.
Seese, 517 A.2d at 922. (Citations omitted.) The court also opined that, if experts were permitted to testify as to the credibility of a particular class of witnesses (abused children), then "one could imagine `experts' testifying as to the veracity of the elderly, various ethnic groups, of members of different religious faiths, of persons employed in various trades or professions, etc." Id., at 922. The result would be to
encourage jurors to shift their focus from determining the credibility of the particular witness who testified at trial, allowing them instead to defer to the so-called "expert" assessment of the truthfulness of the class of people of which the particular witness is a member. In addition, such testimony would imbue the opinions of "experts" with an unwarranted appearance of reliability on a subject, veracity, which is not beyond the facility of the ordinary juror to assess.
Id.[13] (Emphasis in original.)
Many states have echoed this sentiment. North Carolina has, on virtually the same basis, rejected this species of expert testimony on credibility, stating that "[t]he jury is the lie detector in the courtroom and is the only proper entity to perform the ultimate function of every trialdetermination of the truth." State v. Chul Yun Kim, 318 N.C. 614, 350 S.E.2d 347, 351 (1986). Kansas has also failed to embrace this sort of expert assistance as "human lie detectors for the child", asserting that it is "the function of the jury to hear the testimony of the witnesses as to what the child said, and then make a determination of the reliability of the child's statements." State v. Jackson, 239 Kan. 463, 721 P.2d 232, 238 (1986). The Supreme Court of Oregon, in what may be the most emphatic rejection of proffers of such expert testimony, has stated that
We have said before, and we will say it again, this time with emphasiswe really mean itno psychotherapist may render an opinion on whether a witness is credible in any trial conducted in this state. *1129 The assessment of credibility is for the trier of fact and not for psychotherapists.
State v. Milbradt, 305 Or. 621, 756 P.2d 620, 624 (1988). (Emphasis in original.)
Courts have also been concerned with unfair prejudice to the defendant from this type of expert testimony. Prejudice can result from the testimony's giving "factfinder[s] ... little more than a false sense of security based on the incorrect assumption that a reasonably accurate scientific explanation [for behavior] has been provided." Morse, supra, at 1026. This testimony on credibility has the effect of "putting an impressively qualified expert's stamp of truthfulness" on a witness' testimony. Azure, supra, at 340. This "stamp" has the effect of "so bolstering a witness' testimony ... [as to] artificially increase its probative strength with the jury and ... its admission may in some situations on this basis constitute reversible error." Homan v. United States, 279 F.2d 767, 772 (8th Cir.), cert. denied, 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88 (1960).
This bolstering of credibility has the effect of unfairly prejudicing a criminal defendant, and, as such, the use of CSAAS-based testimony for the purpose of bolstering a witness' credibility creates a risk of prejudice that outweighs its questionable probative value. Given the near unanimity of other jurisdictions' disapproval of CSAAS-based testimony as a determinant of abuse, coupled with our observations of the risk of prejudice inherent in CSAAS, this court now concludes that such opinion testimony as a determinant of a victim/witness' credibility is not admissible.

VI.
Several jurisdictions have wrestled with the problem of admission of this testimony for any purpose. Some jurisdictions have allowed its admission for the limited purpose of rebutting attacks on the victim's credibility based on inconsistent statements, limited disclosures, or recantations of the testimony. See State v. Moran, 151 Ariz. 378, 728 P.2d 248 (1986); Smith v. State, 100 Nev. 570, 688 P.2d 326 (1984); State v. Hicks, 148 Vt. 459, 535 A.2d 776 (1987). Other jurisdictions have flatly refused its admission at all. See State v. Myers, 382 N.W.2d 91 (Iowa 1986); Commonwealth v. Seese, supra.[14] After weighing the varying approaches, this court has decided to follow the former approach, and allow the testimony to be admitted for very limited purposes.
When dealing with expert testimony, the critical question is "On this subject, can a jury receive appreciable help from this person?" Comment, "Psychological Expert Testimony on a Child's Veracity In Child Sexual Abuse Prosecutions", 50 La.L.R. 1039, 1047, citing 3A J. Wigmore, A Treatise on the Anglo-American System of Evidence in Trials at Common Law § 509 (J. Chadbourne rev. ed. 1978). "Under certain circumstances, expert psychiatric testimony may reveal to the trier of fact characteristics or conditions of the witness which may assist the jury's assessment of credibility." State v. Kim, 64 Haw. 598, 645 P.2d 1330, 1334 (1982). The two most prevalent of these characteristics that may confound a jury are recantation and delayed reporting. 50 La. L.R. at 1046. The court in State v. Myers, 359 N.W.2d 604, 610 (Minn.1984), summed up the need for an expert to "place it in perspective":
The nature ... of the sexual abuse of children places lay jurors at a disadvantage. *1130 Incest is prohibited in all or almost all cultures, and the common experience of the jury may represent a less than adequate foundation for assessing the credibility of a young child who complains of sexual abuse ... By explaining the emotional antecedents of the victim's conduct and the peculiar impact of the crime on other members of the family, an expert can assist the jury in evaluating the credibility of the complainant.
The proper presentation of this sort of expert testimony must focus on explaining to a jury why "superficially bizarre" reactions such as delayed reporting, etc. take place in such cases. Wheat v. State, 527 A.2d 269, 273 (Del.1987). The opinion testimony must "seek to demonstrate or explain in general terms the behavioral characteristics of child abuse victims in disclosing alleged incidents," without giving "testimony directly concerning the particular victim's credibility." State v. Spigarolo, 210 Conn. 359, 556 A.2d 112, 123 (1989). If the testimony is limited in this fashion, then it is of assistance to the jury
in evaluating the psychological dynamics and resulting behavior patterns of alleged victims of child abuse, where the child's behavior is not within the common experience of the average juror.
Wheat, supra, at 275. See also, Frenzel v. State, 849 P.2d 741 (Wyo.1993).
The expert testimony on why victims might recant or delay reporting is being offered to rebut attacks on the victim's credibility. So long as the expert limits the testimony to general characteristics that would explain delays in reporting, recantations, and omission of details, the testimony will not
substitute [the expert's] estimation of credibility for that of the jury. Rather, it is to provide a scientific perspective for the jury according to which it can evaluate the complainant's testimony for itself.
Goldstein, "Credibility and Incredibility: The Psychiatric Examination of the Complaining Witness", 137 Am.J.Psychia. 1238, 1240 (1980).
In the instant case, the expert testified as to his expert opinion on the victim's credibility, and did not limit his testimony to general information about possible psychiatric explanations for the delay in reporting. In fact, the expert based most of his opinion upon the "level of detail" of the child's description of the sexual abuse. He concluded with an objected-to summation that, in his expert opinion, the witness was telling the truth on that occasion as to whether abuse had occurred. This expert assessment of the witness' credibility was improper, making the trial court's overruling of the objection erroneous.

VII.
Finally, as there was error in the admission of the testimony, we must, before considering whether or not to reverse, determine whether or not it was harmless. La. C.Cr.P. art. 921 recognizes that not all errors require reversal, as it mandates that
(a) judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused.
This sentiment was echoed by this court in State v. Gibson, 391 So.2d 421, 428 (La.1980):
Our state constitution and statutory harmless error rule admonish a reviewing court generally to shun factual questions and to reverse only when substantial rights of the accused have been affected.
When considering the erroneous admission of evidence, this court has set out the test to be "whether there is a reasonable possibility that the evidence might have contributed to the verdict, and whether the reviewing court is prepared to state beyond a reasonable doubt that it did not." State v. Walters, 523 So.2d 811 (La.1988).
In this instance, the state's case was based largely upon the testimony of the victim. The inadmissible expert testimony served to unduly bolster this testimony and, in all probability, made it much more believable to *1131 the jury. Consequently, the jury probably gave the testimony of the victim more weight than it, standing alone, would have otherwise received. Given this effect of the expert's testimony, this court is not prepared to state that, beyond a reasonable doubt, the testimony of Dr. Janzen had no effect on the guilty verdict. Thus, the error is not harmless, and warrants reversal.

VIII.
Child abuse is a pernicious problem in our society that must be properly addressed and extirpated. However, in our efforts to deal with this growing problem, we should balance other "competing considerations", such as a defendant's right to a fair trial. Wheat v. State, supra, at 274, citing State v. Myers, supra, at 97. After undertaking the exercise of balancing these concerns, this court has determined that CSAAS-based evidence should be admissible only for the limited purpose of explaining, in general terms, certain reactions of a child to abuse that would be used to attack the victim/witness' credibility.
We noted early on in this opinion that no evidentiary hearing was held pursuant to the trial court's gatekeeping function to determine the Daubert factors governing admissibility of the expert evidence presented in this case. Accordingly, our analysis of the issues is based on consideration of the information gleaned from prior reported cases and published literature on the subject matter. The rules established in this decision pertaining to this developing area are not necessarily static. These rules do not preclude consideration by a trial court, performing its gatekeeping function via an evidentiary hearing, of the admissibility of psychological testimony in sexual abuse cases for certain limited purposes, based on current evidence bearing on the reliability and accuracy of this type of evidence.
As the State's use of CSAAS-based testimony was not so limited at the trial court, it constituted an improper comment on the victim's credibility, and served to unduly prejudice the defendant. As this prejudice created an error that was not harmless, we must and do hereby reverse the conviction and remand the case to the district court for a new trial.
REVERSED AND REMANDED.
DENNIS, J., concurs with reasons.
LEMMON, J., concurs and assigns reasons.
LEMMON, Justice, concurring.
I concur in the reversal of the conviction because, for the reasons stated in Part II, the trial court erroneously allowed the testimony of a psychologist (or failed to grant a continuance) when the prosecutor did not furnish a copy of the psychologist's report to the defense until the morning of the trial. I also concur in the reversal based on Part V because the court allowed the psychologist to state his expert opinion on the credibility of the prosecuting witness' testimony that she had been sexually abused. However, I would decline to define in this case the limitations on the admissibility of testimony of a psychologist regarding his experience in the treatment of sexually abused children.[1] I would simply reverse, allowing the trial court on remand to perform the "gatekeeping" function and to determine the reliability of any expert evidence under the Daubert criteria.
NOTES
[1] Kimball, J., not on panel. For the procedure employed in assigning cases after January 1, 1993 to rotating panels of seven justices, see State v. Barras, 615 So.2d 285, 286 n. 1 (La.1993).
[2] When faced with such a discovery violation, the normal remedy is not suppression of the evidence. In State v. Arnaud, 412 So.2d 1013, 1017 (La.1982), this court noted that counsel should ask for a continuance or recess before a reviewing court should consider the drastic remedy of granting a new trial. See also State v. Busby, 464 So.2d 262 (La.1985). Defense counsel did not request such a continuance or recess. In this case, however, such a request would have been a vain and useless act, as, at trial, the trial judge assured counsel that the motion for continuance would be denied, as the report itself was unnecessary since the witness who authored it would be testifying.
[3] At trial, counsel for defendant objected to Dr. Janzen giving an opinion on the existence of sexual abuse, as this was the "fact and [sic] issue here". The objection was overruled, and the doctor was allowed to comment upon the issue of whether or not the child had been sexually abused. As counsel for the defendant objected to the nature of Dr. Janzen's testifying on whether or not the victim was telling the truth as to the existence of abuse, this objection has not been waived and this issue is properly before us on appeal. See State v. Huizar, 414 So.2d 741 (La. 1982).
[4] F.R.E. 702 provides that

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
[5] F.R.E. 403 provides that

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
La.C.E. art. 403 is almost identical:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
[6] Catanese set forth a probative value versus prejudicial effect balancing test, focusing upon concerns that the trier of fact might assign too much weight to the expert opinion, the quality of such evidence, and the existence of either judicially or legislatively-created "procedural safeguards" regulating the admissibility of such evidence at trial. Id., at 981-982.
[7] We will assume for the purposes of argument that, as Dr. Janzen's testimony is based upon the science of clinical psychology and psychodynamic theory, it will qualify as "scientific" expert testimony.
[8] In the absence of such a hearing, only a scientific method's proven "inherent reliability" will allow a court to take judicial notice of the accuracy of scientific testimony and evade the requirement for an evidentiary hearing on the reliability of such testimony. See State v. Rimmasch, 775 P.2d 388, 398 (Utah 1989). The Rimmasch court went on to note that CSAAS was not so inherently reliable so as to justify a court's taking judicial notice of the reliability of such testimony. Id., at 401.
[9] Even though Dr. Janzen based most of his opinion upon the detail of the allegations as opposed to the enumerated CSAAS dynamics, he did refer to CSAAS-based factors as part of the basis of his opinion. Since some of his testimony did contain elements of CSAAS, its scientific validity is properly before us.
[10] Morse states that

Because there are no acceptable criteria for determining the validity of a (psychodynamic theoretical) formulation, at the very least one would expectindeed, one should require that proponents of psychodynamic theory would perform reliability studies of psychodynamic formulations carefully and constantly. But they have not done so. The very few studies of the reliability of dynamic formulations that exist are mostly impressionistic and suggest that these formulations are unreliable. Independent dynamicists do not agree on the explanations of individual cases. Thus, if a dynamicist offers a formulation at a professional meeting, in a courtroom, or in a consulting room, it is virtually certain that another colleague would have explained the case differently on the basis of the same data. As an intuitive matter, it would be extraordinary to claim that all are correct causal accounts. The measuring instrument of psychodynamic psychologythe clinician observer applying his or her own theoryis simply unreliable.
Morse, supra, at 1022-23. (Citations omitted.)
[11] Morse exhorts courts to resist this sort of evidence, especially in criminal trials:

But the law should resist the sirens of dynamic psychology ... If we wish to hear tales about why people behave ... let us do so honestly and have them told by novelists and poets. The difficulty when dynamic clinicians tell these tales is that the tales are then enshrouded in the white coats of science and medicine. Id., at 1016.
As the Rimmasch court pointed out,
... nothing has come to our attention suggesting a general acceptance of the proposition that those who regularly treat symptoms of sexual abuse are capable of determining with a high degree of reliability the truthfulness of allegations that one has been abused. In fact, the better view of the matter is one to the contrary.
775 P.2d at 406.
[12] "The consensus among scholars is that there are as yet no scientifically reliable indicators of child sexual abuse." State v. J.Q., 252 N.J.Super 11, 33, 599 A.2d 172, 184 (1991).
[13] In all probability, the admission of such testimony will obfuscate the issues that the jury should consider at trial and will result in a "battle of the experts":

Dynamic formulations present a dilemma to the factfinder. At present, no acceptable means exist to externally verify an individual formulation, and it is entirely likely that any particular formulation will be unreliable. An unseemly battle of the experts is all but inevitable, for neither the proponent nor opponent of a psychoanalytical formulation can point to external validity criteria to buttress the accuracy of a causal account of the (subject's) behavior.
Morse, supra, at 1026.
[14] The best summation of this restrictive approach comes from Pennsylvania. In Commonwealth v. Dunkle, 529 Pa. 168, 602 A.2d 830, 838 (1992), the court refused to allow the admission of expert testimony on the issue as to why a child would delay reporting abuse or omit details of the abuse, stating that

we do not believe that there is any clear need for an expert to explain this to a jury. This understanding is well within the common knowledge of jurors. Additionally, the prosecutor is able to elicit such information from the child during testimony. As such, the need for expert testimony in this area is not apparent.
* * * * * *
A child's recollection of the event is another factor for the jury to determine when weighing credibility and we believe it would impermissibly infringe upon their determination to permit expert testimony on this point. As such, we find that it was error to admit an expert's testimony on the subject of delay of reporting, omission of details, and the inability to recall dates and times. (Emphasis in original.)
[1] It may be appropriate, for example, for an expert to testify that certain behavior is, in his experience, consistent with sexual abuse.