767 So.2d 754 (2000)
Wade TERREBONNE, Individually and as Natural Tutor of the Minor, Derek James Terrebonne and Rachel Terrebonne
v.
John C. FLOYD, M.D.
No. 99 CA 1036.
Court of Appeal of Louisiana, First Circuit.
May 23, 2000.
*755 Sean D. Fagan, Baton Rouge, for Plaintiff Appellee Wade Terrebonne, et al.
Emilie M. Daye, Joseph A. Reilly, Jr., Houma, for Defendant Appellant John C. Floyd, M.D.
Before: COOKS, WOODARD and AMY, JJ. Judges Pro Tempore by special appointment of the Louisiana Supreme Court.
COOKS, Judge Pro Tem.
Dr. John C. Floyd appeals the trial court's denial of his motion for summary judgment on the issue of causation. The trial court also deferred considering Dr. Floyd's motion in limine which seeks to exclude or limit plaintiffs' expert's testimony on causation. For the following reasons, we affirm.

FACTS
On September 1, 1994, Rachel Terrebonne visited Dr. John Floyd, a gynecologist, complaining of left lower quadrant pain. Dr. Floyd treated Mrs. Terrebonne for several years prior to this visit. On this date, his physical examination of her revealed no distinct uterine mass. He ordered certain blood tests, a pelvic ultrasound, and a urine pregnancy test. The urine pregnancy test result was negative. When Mrs. Terrebonne returned the next day, she was advised by Floyd that the ultrasound revealed a cyst in her left ovary. Dr. Floyd concluded her pelvic pain was the result of endometriosis. He ordered a second urine pregnancy test; and the result again was negative. He then prescribed a 150 milligram injection of Depo-Provera to treat the suspected condition. Mrs. Terrebonne was instructed to return in two to four weeks for a follow-up examination.
On September 8, 1994, six days after receiving the Depo-Provera injection, Mrs. Terrebonne telephoned Dr. Floyd's office complaining of nervousness. Dr. Floyd's office informed her this was a normal side effect of Depo-Provera. She called again two days later complaining of depression and uncontrollable crying. Dr. Floyd prescribed Xanax, an anti-depression drug to treat this condition. On September 30, Mrs. Terrebonne finished taking the prescribed doses of Xanax and called Dr. Floyd to request a refill. Dr. Floyd advised her to return to his office for a "check-up." An appointment was scheduled for this visit on October 3, 1994.
On October 3, 1994, Dr. Floyd ordered a third urine pregnancy test. The result was positive for pregnancy on this occasion. A later ultrasound confirmed Mrs. Terrebonne was seven weeks pregnant. Blood results revealed she had a low progesterone level, prompting Dr. Floyd to prescribe Micronized Progesterone to treat this abnormality. The weeks that followed these discoveries were uneventful; and Mrs. Terrebonne delivered a son by caesarian section on May 15, 1995. The baby was born with a skull malformation known as craniosynostosis. This condition distorted the shape and appearance of Derek's face; and Derek's skull is incapable of enlarging without surgical intervention to accommodate the growth of his brain. On July 12, 1995, a craniofacial reconstruction was performed on Derek. Subsequently, two more surgical procedures *756 were performed to enlarge his skull which will require regular surgical enlargement until he fully matures physically.
The Terrebonnes filed a complaint with the Patient Compensation Fund requesting a medical review of Dr. Floyd's treatment. They alleged Dr. Floyd breached the standard of care owed to Rachel Terrebonne when he prescribed Depo-Provera and Xanax in the early stages of her pregnancy; and his negligence was a cause in fact of Derek Terrebonne's skull malformation.
The Terrebonnes also alleged the package labeling for Depo-Provera includes a warnings section which, under the heading "Accidental Pregnancies," states:
To ensure that Depo-Provera is not administered inadvertently to a pregnant woman, it is important that the first injection be given only during the first 5 days after the onset of a normal menstrual period...
The same information is repeated in the "DOSAGE AND ADMINISTRATION" section of the label. The medical evidence shows Mrs. Terrebonne began her last menstrual period prior to receiving the Depo-Provera injection on August 15, 1994. She received the injection on September 2, 1994, eighteen days after the onset of her cycle; and thirteen days beyond the safety period specified by the drug's manufacturer.
Plaintiffs further alleged Dr. Floyd was negligent in prescribing Xanax to Mrs. Terrebonne. Xanax is a benzodiazepine class drug and its manufacturer warns "can potentially cause fetal harm when administered to a pregnant woman." The manufacturer also warns that the "possibility that a woman of child bearing potential may be pregnant at the time of institution of therapy should be considered."
The Medical Review Panel unanimously found Dr. Floyd did not breach the standard of care, noting he exercised adequate precaution in administering the drug and commenting that Depo-Provera is an accepted treatment for endometriosis.
The Terrebonnes then filed a medical malpractice petition in the district court against Dr. Floyd on August 25, 1997 essentially alleging the same complaints they asserted before the Medical Review Panel. Discovery was conducted and the matter was set for trial to commence on December 14, 1998. On November 23, 1998, Dr. Floyd filed a motion for summary judgment on the issue of causation. Hearing on the motion was set for December 4, 1998. On that date, plaintiffs requested a continuation of the hearing in order to allow additional time to secure an affidavit from one of Derek's treating physicians, Dr. Tal Thomas. The trial court granted the continuance and hearing on the motion was rescheduled for December 10, 1998.
Dr. Thomas' affidavit was submitted at the December 10 hearing. Contending Dr. Thomas' conclusions were not scientifically grounded, Dr. Floyd also filed a Motion in Limine asking the trial court to exclude or limit his testimony on causation. After arguments, the trial court denied the motion for summary judgment on the issue of causation. The trial court deferred considering Dr. Floyd's motion in limine. Dr. Floyd appealed the trial court's judgment, asserting the following assignments of error:
1. The trial court erred in considering Dr. Thomas's supplemental affidavit which conflicted with his earlier deposition testimony.
2. The trial court erred in not exercising its gatekeeping function to evaluate the expert testimony on which plaintiffs relied for their proof of causation.
3. The trial court erred in denying Dr. Floyd's motion for summary judgment when it was clear plaintiffs would not be able to prove the element of causation.

STANDARD OF REVIEW
Appellate courts review summary judgments de novo under the same criteria *757 that govern the district court's consideration of whether summary judgment is appropriate. Potter v. First Federal S & L, 615 So.2d 318 (La.1993). A motion for summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits show that there exists no genuine issue as to any material fact and that the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966.
The first issue that must be addressed in reviewing a trial court's grant of summary judgment is whether any genuine issues of material fact exist. Smith v. Our Lady of the Lake Hosp. Inc., 93-2512 (La.7/5/94); 639 So.2d 730. The reviewing court must next address whether reasonable minds could conclude, based on the facts presented, the mover is entitled to judgment. Id. In other words, summary judgment is appropriate when all relevant facts are brought before the court, the relevant facts are undisputed, and the sole issue remaining is the conclusion to be drawn from the relevant facts. Id.
The 1996 amendment to the summary judgment provision changed pre-existing law by declaring that summary judgments are now favored. The amendment did not change the existing law and jurisprudence concerning genuine issues of material fact and the burden of proof applied to a summary judgment proceeding. Scott v. McDaniel, 96-1509 (La.App. 1 Cir. 5/9/97); 694 So.2d 1189, writ denied, 97-1551 (La.9/26/97); 701 So.2d 991. The burden is still on the mover to show there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law.

ANALYSIS
Dr. Floyd contends Dr. Thomas' affidavit "contradict[s] his earlier deposition," and "should not have been considered by the court in deciding the motion for summary judgment." The First Circuit has held that a supplemental affidavit which contradicts earlier deposition testimony is not sufficient to create an issue of fact precluding summary judgment. Douglas v. Hillhaven Rest Home, Inc., 97-596 (La.App. 1 Cir. 4/8/98); 709 So.2d 1079, writ denied, 98-1793 (La.10/30/98); 727 So.2d 1161; LeBlanc v. Dynamic Offshore Contractors, 626 So.2d 16 (La.App. 1 Cir.1993). However, when an affidavit merely supplements rather than contradicts prior deposition testimony, the court may consider the affidavit when evaluating genuine issues in a motion for summary judgment. S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489 (5th Cir.1996).
Dr. Floyd argues Dr. Thomas changed his opinion elicited during the taking of his deposition testimony in his later affidavit as to the cause of Derek's craniosynostosis. Dr. Floyd notes that in his deposition, Dr. Thomas spoke of the "possibility" of a causal connection between the various drugs administered to Mrs. Terrebonne and Derek's abnormalities. Dr. Floyd argues Dr. Thomas'"possibility" expressions are inconsistent with the statements found in his later affidavit in which he relates it is "more likely than not" a causal connection exists between the noted drugs and Derek's abnormalities. Plaintiffs, on the other hand, contend all Dr. Thomas did in his affidavit was clarify what he meant when he used the term "possibility" in his deposition.
The trial court did not render reasons for judgment, and we do not know how much weight, if any, it assigned Dr. Thomas' affidavit. However, the trial judge was not prevented from considering the affidavit which he could have reasonably concluded was merely a clarification of Doctor Thomas' earlier testimony.
Further, we find the trial court did not err in concluding that Dr. Floyd failed to sufficiently prove no material question of fact still exists concerning causation in this case. Dr. Thomas' testimony presents factual questions concerning the administration of the various drugs and the linkage *758 between the drugs and Derek's injuries.
Dr. Floyd also claims the trial court declined to apply the gate keeping standard articulated by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This standard, which was adopted by the Louisiana Supreme Court in State v. Foret, 628 So.2d 1116 (La.1993), requires that "expert scientific testimony must rise to a threshold level of reliability in order to be admissible under La.C.E. art. 702." Id. at 1123.
We note the trial court did not decline to exercise this "gate keeping" function, but instead chose to defer the Daubert hearing until the morning of the trial on the merits. His decision to do so was not an abuse of his wide discretion in this area. Further, we note Dr. Floyd has the option of reurging his motion for summary judgment after the Daubert hearing is conducted, provided he gives sufficient notice of such intent prior to trial.

DECREE
For the foregoing reasons, the judgment of the trial court denying the motion for summary judgment on causation is affirmed. All costs of this appeal are assessed to defendant-appellant, Dr. John Floyd.
AFFIRMED.
WOODARD, J., concurs in result.