laCHEHARDY. Judge.
Plaintiffs appeal a jury verdict which awarded damages for the husband’s injuries and medical expenses arising from a vehicular collision, but denied the wife’s claim for loss of consortium. They seek an increase in the damage awards and also seek an award for loss of consortium. Defendants have answered the appeal, seeking reversal or reduction of the awards for certain elements of the damages. We affirm.
Joseph Genovese and Wendy Genovese, his wife, filed suit for Joseph’s injuries from a rear-end collision with a Louisiana Gas Service Company vehicle driven by Coyle Ferrygood. The defendants stipulated to liability, leaving damages as the only issue for trial. After a three-day trial the jury returned a verdict in favor of Joseph Genovese in the amount of $18,-650.00, consisting of $5,000 for general damages, $2,400 for loss of earning capacity, and $11,250 for past and future medical expenses. The jury found that Wendy Genovese had not suffered a loss of consortium.
Plaintiffs moved for judgment notwithstanding the verdict or, alternatively, for new trial conditioned on an additur and for new trial on the assessment of expert fees. The trial court denied the motion for JNOV and for new trial on the damages, but increased the expert witness fees of three of plaintiffs’ four experts.
On appeal plaintiffs assign the following errors: (1) the trial court erred in denying their motion in limine to prohibit the testimony of defense expert Dr. Monroe La-borde regarding the amount of G-force exerted during the collision and its effect on plaintiff; (2) 13the jury erred in awarding only $5,000 general damages; (3) alternatively, the jury erred in concluding that Joseph’s 1997 back surgery was not related to the accident; (4) the jury erred in awarding only $11,250 in medical expenses; (5) the jury erred in awarding only $2,400 for loss of earning capacity; and (6) the jury erred in failing to award Wendy Ge-novese damages for loss of consortium.
In the answer to the appeal, defendants assert the jury award of $2,400 for loss of earning capacity should be reversed and that the award of $11,250 for medical expenses is excessive and should be reduced.
FACTS
The accident occurred on September 25, 1996 on River Road (Louisiana Highway 44) near its intersection with Prospect Avenue in Norco. Joseph Genovese, a self-employed home renovation contractor, was driving his Dodge pickup truck pulling a twenty-foot utility trailer with a load of hay. His brother, Louis “Butch” Ge-novese, was a passenger. As they approached the intersection Joseph slowed the truck to a stop due to traffic congestion. He heard the squealing of brakes behind them and then the trailer was *979 struck by a Jeep Wrangler truck, owned by Louisiana Gas Service Company (LGS) and being driven by its employee, Coyle Ferrygood.
Although Joseph did not feel injured immediately after the accident, he began suffering pain the next day. Several months after the accident he underwent back surgery for a bulging disc that he claims was causally related to this accident.
The trial evidence was directed to whether Joseph Genovese’s back complaints and subsequent surgery were causally related to the accident, whether he suffered a loss of earning capacity because of the injuries, and whether Wendy Ge-novese experienced loss of consortium with her husband as a result of his injuries. (For convenience hereafter our use of the term “plaintiff’ will refer to Joseph Ge-novese.) The testimony focused on the degree of the impact between the vehicles, on whether plaintiffs back pain resulted from trauma of the accident or was an aggravation of a pre-existing back problem exacerbated |4by the physical strain of manual labor in his work, and on whether the injury would prevent him from earning as much in the future as he earned in the past.
The accident was investigated by St. Charles Parish Sheriffs Deputy Ruche J. Marino Jr. Marino characterized the accident as low-level and stated he saw no damage to any of the vehicles. All the vehicle occupants responded negatively when he asked if they were injured.
Both Joseph and Butch Genovese admitted that Joseph’s truck, which was a dually model (having double wheels on the rear end), did not move forward upon impact. They testified, however, that the impact bent down the rear bumper of the trailer at a 45-degree angle and caused the tongue of the trailer to bend downward, so that the rear axle of the trailer became slightly elevated off the ground.
Defendant Coyle Ferrygood characterized the impact as a “tap.” The only damage he saw was that the trailer bumper was dented a little and his Jeep had a little brown scratch on its bumper from the trailer. He did not observe the trailer to be bent down or to have any of its wheels off the ground.
After the accident plaintiff returned briefly to his home in Laplace, then drove his brother and the trailer back to Loran-ger, where Butch lives. Plaintiffs wife and son accompanied him. On the way back to Laplace, plaintiff noticed pain in his neck, elbow and down the left side of his leg. He asked his wife to drive the pickup truck home. Wendy testified that the day after the accident, he complained to her of pain, especially shooting pains down his leg.
The next day plaintiff saw his chiropractor, Dr. Robert Dale. Dr. Dale testified that plaintiff was complaining of low back pain, but primarily pain in his left leg, in the area of the left sciatic nerve, and in his right elbow and neck. Dr. Dale’s initial diagnosis was cervical lumbosacral sprain/ strain.
Plaintiff had been a patient of Dr. Dale for several years and had last seen Dr. Dale nine months earlier for complaints of knife-like pain in his lower back and left hip. | ¡¿Plaintiff had a pre-existing disability of his back resulting from a 1991 injury, for which he had undergone surgery several years prior to this accident.
Dr. Michael Carey, a neurosurgeon, had performed a partial hemilaminectomy on plaintiff in April 1992 at the L4-5 level on the right. When Dr. Carey discharged plaintiff several months post-surgery, he projected plaintiff would have a ten percent permanent disability as a result of the surgery and advised plaintiff to refrain from work that involved repetitive straining, twisting or lifting more than 25 to 50 pounds.
Following the 1992 surgery plaintiff also underwent a series of chiropractic treat *980 ments by Dr. Dale through January, 1993. Subsequently he saw Dr. Dale in December 1995, as mentioned above, complaining of low back pain, which plaintiff attributed to having worked in the cold all day climbing up and down a ladder.
After the 1996 accident made the basis of this suit, plaintiff was treated by Dr. Dale on five visits. When Dr. Dale was unable to achieve satisfactory pain alleviation with conservative treatment, he requested an MRI scan in November 1996 and then referred plaintiff to Dr. Carey, who had performed the prior back surgery. Dr. Dale testified he believed that plaintiffs back pain resulted from the 1996 accident.
Dr. Carey performed various examinations and tests, including a myelogram and a CT scan, eventually diagnosing an L4-5 disc bulge on the left. This was the same portion of the spine on which Dr. Carey had previously operated, except this time the disc bulge was on the opposite side. On January 15, 1997, Dr. Carey performed another partial hemilaminectomy at L4-L5, this time on the left side. Dr. Carey testified he believed the injury was the result of the September 1996 accident. He stated that in the history given him by plaintiff, plaintiff stated he had been doing well for the past three years.
Plaintiff admitted at trial that despite Dr. Carey’s restrictions, he had continued doing home remodeling work after recovering from the prior surgery. He had performed work for Dr. Dale in the month after the 1996 accident which involved cleaning a fishing camp that had been flooded and coated in mud. That work included dismantling and removal of old cabinets and other debris from the interior of the building, as well as | fipressure-wash-ing the interior and exterior of the building to remove the mud buildup. The plaintiff testified, however, that although he held the hose of the pressure washer, other work was performed by his son and he hired someone to haul away the trash. Plaintiff also had performed extensive remodeling on his own home since his prior surgery, although there was little specific testimony about the intensity of the tasks he performed during the remodeling.
Wendy Genovese testified that her marital relationship with plaintiff suffered because of his pain, in that he could no longer sleep with her in their bed and he could no longer maintain an erection. She stated that they had had an intimate and loving relationship during their 20-year marriage, but could no longer have marital relations. She also testified that plaintiffs inability to work due to his back pain required her to work extra hours, further limiting their marital interactions and their time together as a family.
Wendy admitted, however, that she is in end-stage renal disease and must perform self-dialysis of her kidneys four times a day. It was clear that problems due to her kidney disease have affected many areas of her life.
Plaintiffs’ expert vocational evaluation specialist, Bobby Roberts, testified that plaintiff has less than an eighth-grade education and his reading and mathematics skills tested at primary-school levels. Plaintiff has performed medium to heavy physical labor most of his life in unskilled or semiskilled positions. Although plaintiff tested well on physical coordination, he is limited in continuing his former occupation as a home renovation contractor due to the limitations placed on his movement and lifting abilities. Roberts stated that plaintiffs physical limitations require a sedentary or light-work occupation, but such occupations generally require higher academic levels and plaintiff is functionally illiterate.
The defendants presented testimony of Dr. Monroe Laborde, who was accepted by the court as an expert orthopedic surgeon and an expert in the field of biomedical mechanics. Dr. Laborde stated he compared the September 1992 MRI with the November 1996 MRI. He concluded the abnormalities at L4-L5 appeared so simi *981 lar there were no ^findings which could be attributed to the intervening accident. He stated that Dr, Carey’s surgical notes do not describe an abnormality of the type caused by trauma, such as an extruded disc fragment. Rather, the abnormalities Dr. Carey observed during surgery were consistent with the results shown by the myelogram and the CT scan done prior to the surgery, showing a combination of degenerative changes and scar tissue.
Dr. Laborde commented further that the January 1997 myelogram showed an abnormality on the left side which did not appear on the November 1996 MRI. He concluded that something happened between November 1996 and January 1997 which caused the abnormality that appeared on the myelogram. Since the accident occurred in September 1996, he felt it was clear the abnormality was not attributable to the accident.
Dr. Laborde also noted if the auto accident was the major cause of a back injury, the symptoms should have been maximum during' the month after the accident. Plaintiff had not informed Dr. Laborde of the work he had done for Dr. Dale in the month after the accident. When asked at trial how such work might affect someone with a degenerative back condition, the doctor affirmed that such work could cause plaintiffs symptoms. Dr. Laborde said plaintiffs ability to perform the work for ■Dr. Dale indicates either that he was not injured in the accident or that he had recovered from any injuries. Any subsequent problems he had most likely would be due not to the auto accident, but to something else that happened later, either another injury or a progression of degenerative arthritis.
Finally, Dr. Laborde testified that this was a low-force accident, because the repairs to the car cost only $600 and the accident report indicates the police officer observed no defects in either vehicle. He noted that injuries to the low back are less likely in a rear-end collision than head injuries, because the spine is supported by the seat back. He stated that the G-force to the lower back in a low-impact accident would be less because the back is protected by the seat.
|sDr. Laborde concluded it was very unlikely that plaintiff sustained a low back injury in this accident because it was low-impact and there was no objective evidence of injury that could either aggravate his pre-existing condition or cause disc injury.
Dr. Daniel H. Johnson, Jr., accepted by the court as an expert radiologist, testified his office performed the second MRI scan on plaintiff. Like Dr. Laborde, Dr. Johnson compared the 1992 MRI scan with the 1996 MRI and found no change in the condition of plaintiffs back. He concluded that from an anatomic and pathologic standpoint, the two MRIs are virtually identical and there was no significant change between 1992 and 1996.
Even Dr. Carey admitted the MRI did not show changes.
MOTION IN LIMINE
The first issue on appeal is whether the trial court erred in denying plaintiffs motion in limine. Plaintiff contends the court should have excluded Dr. Laborde’s testimony about the amount of G-force exerted by the impact and the effect it had on plaintiffs back. Plaintiff argues that Dr. Laborde’s testimony fails to satisfy the four factors to determine admissibility of expert testimony, set out in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Daubert standards were adopted by Louisiana in State v. Foret, 628 So.2d 1116 (La.1993) and have been summarized as follows:
To qualify as scientific evidence, an inference, assertion, or opinion must be derived by scientific method.... First, the trial judge must determine in a preliminary hearing whether the expert is proposing to testify to actual scientific knowledge. Second, the trial judge *982 must determine whether such knowledge will assist the trier of fact in understanding or determining a fact in issue.
The court should consider both the validity of the reasoning or methodology and whether that reasoning or methodology properly can be applied to the facts at issue.... It may consider ... the following factors in determining the admissibility of expert testimony:
1. The “testability” of the expert’s theory or technique,
2. Whether the theory or technique has been subjected to peer review and publication,
3. The known or potential rate of error, and
4. Whether the methodology is generally accepted in the scientific community.
9Wehbe v. Waguespack, 98-475 (La.App. 5 Cir. 10/28/98), 720 So.2d 1267, 1998 WL 781958 *7-*8, quoting Clement v. Griffin, 91-1664 (La.App. 4 Cir. 3/3/94), 634 So.2d 412, 426-427, writs denied, 94-717, 94-777, 94-789, 94-791, 94-799, 94-800 (La.5/20/94), 637 So.2d 478-479.
Plaintiff argues that Dr. Laborde’s testimony fails to meet the Dauberb criteria because he opined the G-force was too low to have had significant impact on plaintiffs back, although he did not calculate the G-force estimates for this accident. Thus, he failed to establish a scientific basis for his statement regarding the G-force effect.
First, we note that Dr. Laborde’s testimony was taken by deposition for purposes of perpetuation, under La. C.C.P. art. 1421, and was subject to the parties’ express stipulation that “all objections will be made during this deposition, and are hereby not reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.” Plaintiff failed to object to the G-force testimony during the deposition and thus the objection was waived.
Further, although we agree with plaintiff that defense counsel did not lay a proper predicate for introduction of Dr. Laborde’s testimony regarding G-forces and that the Daubert guidelines were not satisfied, we do not find that admission of the testimony was reversible error. Even without the G-force testimony, we do not find the outcome should be different.
The G-force testimony was far from the only evidence on which the jury could rely. More telling, in our view, was the testimony by three doctors — Dr. Laborde, Dr. Johnson, and Dr. Carey — that there was no change in plaintiffs MRI studies between 1992 and November 1996. That testimony, added to the evidence that plaintiff worked replacing sheetrock and doing home repair and renovation even after the September 1996 accident, establishes a reasonable basis for the jury to conclude that plaintiffs bulging disc on the left L4-L5, for which he had the January 1997 surgery, was not causally related to the accident.
J^GENERAL DAMAGES AWARD
Plaintiff contends that, having found that plaintiff suffered injuries in the automobile accident of September 25, 1996, it was error for the jury to award the inadequate amount of $5,000 in general damages. Alternatively, he asserts, it was error for the jury to conclude that the lumbar surgery performed in January 1997 was not causally related to the accident and to award the inadequate amount of $5,000 in general damages.
It is evident, however, that the jury concluded plaintiffs bulging disc was not due to the accident. The jury’s findings as to extent and duration of the plaintiffs injuries were factual determinations, relying largely on credibility of the witnesses. It is axiomatic that an appellate court may not disturb a jury’s findings unless they are clearly wrong or manifestly erroneous. Ferrell v. Fireman’s Fund Insurance Co., 94-1252 (La.2/20/95), 650 So.2d 742.
*983 “When findings are based on determinations of witness credibility, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.” Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
Applying these standards to our examination of the record, we are unable to find the jury clearly wrong in their obvious conclusion that plaintiffs back surgery was not attributable to the accident.
Plaintiffs alternative argument is that the trial judge’s legal error in admitting Dr. Laborde’s testimony regarding G-forces interdicts the fact-finding process and invalidates the jury’s verdict. He argues that “when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required, whenever possible, to redetermine the facts de novo from the entire record and render a judgment on the merits.” Ferrell v. Fireman’s Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745.
As noted above, however, such a de novo review makes no difference. In our view that the jury did not commit manifest error.
Inlf the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.... Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong.
Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La.1990).
It was reasonable for the jury to conclude that the evidence tended to disprove that plaintiff suffered the disc injury in this accident. Accordingly, we find no reason to change the jury’s damage award, which is not inappropriate for muscle sprain/strain following an accident.
MEDICAL EXPENSES
Plaintiff next asserts that the jury erred when it awarded him the inadequate amount of $11,250 in past and future medical expenses, when evidence was introduced that he had incurred $33,849.98 in past medical expenses and there was sufficient evidence that he would require future medical care as a result of his injuries.
The amount of medical expenses awarded by the jury is nearly the exact amount of medical expenses incurred prior to plaintiffs January 1997 surgery: $2,115 for visits to the chiropractor, Dr. Dale; $775 for the MRI; $996 for examinations by Dr. Carey prior to the surgery; $2,253.20 for a hospital admission on January 7, 1997; $5,318.78 for hospitalization for the MRI; and $246 for other hospital expenses. Those bills totaled $11,701.98. Appellees speculate the jury may have noticed a discount of $450.64 on one bill, subtracted that from the total, and rounded the sum ($11,251.34) to $11,250.
As noted above, we do not find the jury was clearly wrong in refusing to attribute plaintiffs disc surgery to injury from this accident. That conclusion is consistent with Dr. Dale’s testimony that plaintiffs neck condition lasted for three to four months after the accident.
Nor do we find merit to defendants-appellee’s contention in their answer to the appeal that the medical expense award should be reduced. The basis for their claim is that the providers accepted less from plaintiffs insurers than was billed on the invoices. However, that information was contained in a proffer of evidence which the trial court did |12not admit. Further, the contention skirts close to the collateral source rule and we find no authority for considering a remission of the debt between a party’s health insurer, who *984 is not a party to the suit, and the health provider billing for services rendered.
LOSS OF EARNING CAPACITY
Plaintiff contends that, having found him entitled to an award for loss of earning capacity, the jury erred in awarding only $2,400. He cites the evidence that he had doubled his previous disability, would have to curtail his future employment opportunities, and is virtually unemployable outside of the work for which he is fitted by training and experience.
Appellees, on the other hand, contend this award should be reversed. They point out that plaintiff withdrew his claim for past lost wages prior to trial and they assert he failed to prove there would be any difference in his earning ability after the accident.
As mentioned above, the jury reasonably concluded that plaintiffs 1997 back surgery was not the result of injuries from this accident. Accordingly, the loss of earning capacity attributable to that surgery is not compensable here. Nevertheless, there is no question plaintiff suffered some lingering disability after this accident.
There was testimony that plaintiff will have to hire a person to do a portion of the physical labor required in his work or will only be able to accept very specific light-work jobs. The finding does not suggest the jury was confused on this element of damages. Deferring to the wisdom of the trier of fact, we conclude the award is neither too high nor too low and we leave it undisturbed.
LOSS OF CONSORTIUM
Finally, appellant Wendy Genovese argues that the jury erred in failing to award her damages for loss of consortium, having found that her husband suffered an injury in the accident and in light of the uncontroverted testimony of Joseph and Wendy.
Neither of the Genoveses, however, testified about the effect Joseph’s injuries had on their relationship during the three-to-four month post-accident period. Further, it is reasonable that the jury may have concluded the change in the parties’ relationship was attributable more to Wendy’s end-state renal disease than to Joseph’s injuries. Although [ ^neither of them testified as to the effect her kidney failure has had on their marriage, Wendy testified that she has to perform self-dialysis four times a day and she is equipped with a sac for her urine which she must empty periodically.
A claim for loss of consortium encompasses seven elements: loss of love and affection; loss of society and companionship; impairment of sexual relations; loss of performance of material service; loss of financial support; loss of aid and assistance; and loss of fidelity. Rodriguez v. Julius, 96-473 (La.App. 5 Cir. 3/25/97), 694 So.2d 418, 421.
The evidence of loss of consortium depends on credibility determinations by the jury that the plaintiffs were truthful in their loss-of-consortium claims. Reviewing the testimony and the record as a whole, we are unable to say the jury was clearly wrong in refusing to find a loss of consortium. Accordingly, we find no reason to reverse the denial of damages for this item.
For the foregoing reasons, the judgment is affirmed. Costs of appeal are assessed against the defendants-appellees.

AFFIRMED.