790 So.2d 767 (2001)
Dana M. DAVIS
v.
Majorie M. MARTEL and Allstate Insurance Company.
No. 00-1727.
Court of Appeal of Louisiana, Third Circuit.
July 18, 2001.
*768 Archie P. Joseph, Breaux Bridge, La., Counsel for Appellant: Dana Davis.
A.G. Alexander, III, Lafayette, La., Counsel for Appellee: Marjorie M. Martel & Allstate Insurance Company.
Court composed of ULYSSES G. THIBODEAUX, SYLVIA R. COOKS, JOHN D. SAUNDERS, MARC T. AMY, and ELIZABETH A. PICKETT, Judges.
COOKS, Judge.
Dana Davis brought this action against Marjorie Martel and her insurer Allstate Insurance Company (Allstate) for damages arising out of an automobile accident which occurred on August 28, 1997. The trial court entered judgment in favor of Martel and Allstate, finding no casual connection existed between the alleged injuries suffered by Davis and the accident. Davis appeals the judgment and argues the trial court erred in concluding the accident could not have caused her injuries and by allowing Victor Summers, III and Dr. Salvadore J. Cuccione, Jr. to testify as experts. For the reasons provided, we reverse the trial court's judgment and award Ms. Davis damages for her injuries in the amount of $20,000 and past medical expenses in the amount of $3,510.53.

FACTUAL AND PROCEDURAL BACKGROUND
On August 8, 1997 Marjorie Martel collided with the left side of Dana Davis' vehicle while attempting to change lanes on Congress Street in Lafayette, Louisiana. The collision shattered Davis' driver's-side mirror and produced dents and scratches on the side of her vehicle. Davis estimated she was traveling 35 to 40 miles per hour at the time of the collision. After impact, Davis' vehicle came to an immediate stop. Davis testified her head struck the steering wheel as a result of the collision.
On the day following the accident, Davis sought medical treatment at Gary Memorial Hospital complaining of headaches and stiffness in her neck. The emergency room physician reported a positive finding for tenderness in the cervical area, and diagnosed Davis with an acute cervical strain. He prescribed Flexeril and Ibuprofen and advised her to follow up with her family physician if her complaints persisted.
Davis sought treatment from Dr. Raul Reyes, a general practitioner, on September 17, 1997. Dr. Reyes diagnosed her with cervical, lumbar and thoracic spine sprains, and cephalaglgia (headaches). Dr. Reyes advised Davis to obtain physical therapy and provided her a manual for her to conduct a home exercise program. Davis followed both of these recommendations.
By January 14, 1998, four months after the accident, Dr. Reyes continued to treat *769 Davis for neck and back problems, which persisted in causing her discomfort. Dr. Reyes reported she experienced temporal headaches at least twice a day which were often severe. Dr. Reyes admitted he did not know the cause of Davis' headaches at the time, so he recommended she consult a neurologist. On February 2, 1998, Davis again advised Dr. Reyes she was having bad headaches and problems with her jaw. Dr. Reyes assumed a connection between Davis' jaw pain and headaches and referred Davis to Dr. James Pearce, an oral surgeon, who first saw Davis on March 24, 1998. Shortly thereafter, Dr. Reyes released Davis from his care in treating her neck and back which had improved. Dr. Pearce continued to treat her headaches and jaw problems. At the initial consultation, Dr. Pearce recorded Davis' complaints of left side auricular and preauricular pain which radiated to her neck and face, and appeared to be stemming from temporal mandibular joint (TMJ). Based on objective findings, Dr. Pearce diagnosed that Davis was suffering from TMJ related problems[1] and recommended splint therapy for a period of six (6) to (9) months. Davis wore splints on a daily basis for over a year. On her discharge date of August 25, 1999, she advised Dr. Pearce she was wearing her splints only at night. She continued to complain of headaches occurring once a week, but without facial pain or jaw pain.
Allstate requested an independent medical examination of Ms. Davis which was conducted by Dr. Edward Neupert on February 10, 1999. Dr. Neupert's initial report indicated the TMJ related problems experienced by Davis could have been initiated by the accident. However, Allstate provided Dr. Neupert with an opinion written by Victor Summers and Dr. Salvadore J. Guccione Jr., employees of Quick & Associates, which suggested the Biodynamic forces which resulted from the accident could not have caused Davis injury. Based on this report alone, Dr. Neupert issued an amended report then concluding Davis' TMJ related problems could not have resulted from the accident. At trial, the court admitted the expert opinion provided by Allstate and rendered a judgment in accordance with its conclusion that the accident could not have caused Davis injury. Davis appeals the trial court's judgment and argues the following assignments of error:
1. The trial court erred by allowing the testimony of Victor Summers, III and Dr. Salvadore J. Guccione, Jr. as experts when they failed to meet the standards as outlined in Louisiana Code of Evidence art.702, State v. Foret, and Daubert v. Merrell Dow Pharmaceuticals, Inc.

2. The trial court erred by concluding the accident resulted in a minor impact which could `not cause any injury to the plaintiff.'

LAW AND DISCUSSION

Expert Testimony
We review the trial court's decision to admit expert testimony pursuant to La. C.E. art. 702 and note, "[a] trial judge has *770 wide discretion in determining whether to allow a witness to testify as an expert, and his judgment will not be disturbed by an appellate court unless it is clearly erroneous." Mistich v. Volkswagen of Germany, Inc., 95-0939 p. 9, (La.1/29/96); 666 So.2d 1073, 1079.
Louisiana Code of Evidence article 702 states the general rule for the admissibility of expert testimony in Louisiana: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Louisiana adopted the United States Supreme Court's interpretation of Federal Rule of Evidence 702, which mirrors Louisiana Code of Evidence Article 702 in State v. Foret, 628 So.2d 1116 (La. 1993). See White v. State Farm Mutual Automobile Ins. Co., 95-551 (La.App. 3 Cir. 7/17/96); 680 So.2d 1; See also Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In Daubert, the Supreme Court stated, "in order to qualify as `scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validationi.e., `good grounds' based on what is known. In short, the requirement that an expert's testimony pertain to `scientific knowledge' establishes a standard of evidentiary reliability." 509 U.S. at 590, 113 S.Ct. at 2795. The standards imposed by Daubert require the trial court to perform a "gatekeeping" function by deciding whether the expert evidence or testimony is both reliable and relevant. To qualify as scientific evidence, an inference, assertion, or opinion must be derived by a scientific method. Daubert, 509 U.S. at 588, 113 S.Ct. at 2794. We determine whether the reasoning or methodology underlining the proposed testimony pertains to valid scientific knowledge by considering: (1) whether the theory or technique that is the subject of the proposed testimony can be (and has been) be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error; and (4) whether there is general acceptance of a theory or technique within the relevant scientific community. 509 U.S. at 593-94, 113 S.Ct. at 2797.
Davis argues Summers' opinion regarding the accident fails to satisfy the standards imposed by Daubert/Foret to determine the reliability of expert testimony. Davis also argues Summers lacks the credentials to qualify as an expert, and his work history exclusively on behalf of insurance companies prevents him from giving an unbiased opinion. Victor Summers served twenty-two years as Louisiana State Police officer, specializing in accident reconstruction. He completed several advanced accident investigation and reconstruction courses, including instruction at the state police academy. However, Summer's admitted in his deposition he never received a degree in mechanical engineering and is not a licensed, professional accident reconstructionalist. Summers also admitted he has not published any papers, studies, articles, treatises, or reports in the field nor has he completed a seminar, conference, or continuing education class in the past ten years.
The opinion offered by Summers at trial concluded the lateral speed in the collision was less than five miles per hour, and the forward speed at which the parties were driving had no bearing on the impact of the vehicles. Summers also concluded Davis would not have suffered injury as a consequence of the accident. Summers *771 formed his opinion after reviewing the accident's police report, photographs of the two damaged vehicles, an appraisal of the vehicles' damage, and a low impact accident checklist prepared by Allstate. Summers testified he felt it unnecessary to inspect the accident scene, interview the drivers, or examine the vehicles in person to reach his opinion. With respect to determining the lateral speed of the vehicles, Summers testified:
I've done testing and conducted research and I've watched vehicles change lanes in a variety of situations and have actually timed those vehicles in their lane changes. Then from that, I'm able to get an average time of what a normal lane change is. So, we're able to determine the lateral speed for this accident was actually somewhere in the area of two miles an hour. When you compare that with the type of damage on each vehicle, then that tells us that the impact occurred at or less than five miles per hour.
As Summers testified, his research consisted of watching vehicles change lanes and timing them with a stop watch. After recording "a couple hundred cars," Summers concluded the average lane change requires 2.4 seconds to complete. Summers testified dividing this average (2.4 seconds) with the width of the vehicle (approximately 5' 7") yields a speed of 1.6 miles per hour. He concluded this calculation determines the accident occurred at a low speed, and that the forward speed of the vehicles had no bearing on the impact whatsoever. Summers testified he did not rely on any published studies, data or any other reference material to assist in developing his opinion. When asked to cite a scientific publication to substantiate his belief that the forward speed of the vehicles did not affect the impact, Summers stated: "I didn't rely on someone else's research... I have personal hands-on experience into vehicles making lane changes."
The considerations enumerated in Daubert direct our attention to whether Summers' theory or methodology in determining the speed at which the vehicles collided and the forces involved in the impact are testable, subject to peer review, have a known rate of error, and generally accepted within the scientific community. We answer each of consideration in the negative.
Summers testified he arrived at his opinion by reviewing the police report, appraisal, and low impact accident checklist, as well as, viewing photographs of the damaged vehicles. The inferences Summers drew from these materials adhere to no formal principles, specific calculations, or "scientific method" which may be repeated or tested. Even Summers' average lane change speed is suspect, since he did not consider the road conditions, posted speed limits, or various traffic conditions when arriving at the average. Summers admitted he has never made his findings or research available to peer review, and since accuracy of Summers' opinion can not be determined by employing his methodology, the rate of error in his calculations is unknown. Finally, the record does not provide any guidance as to whether the scientific community generally accepts Summers' inferences about the accident's reconstruction or the method employed by Summer to arrive at these inferences. Therefore, we find Summers' opinion concerning the vehicles' impact during the collision does not meet the relevant test for admission of expert testimony. The trial judge erred in allowing Summers to testify concerning the accident, and since Dr. Guiccione testified he based his opinion concerning the biomechanics of the accident solely on the findings and conclusions reached by Summers, we find manifest *772 error in the trial court's admission of his testimony as well.

Injury and Damages
Davis argues the trial court erred in concluding, "the impact to which the plaintiffs vehicle was subjected to could not have resulted in any injury to her." To accept such premise, the trial court essentially is holding that a low estimate of property damage equals minimal impact and therefore minimal injuries or no injuries. The Second Circuit Court of Appeal in Seegers v. State Farm Mutual Auto. Ins. Co., 188 So.2d 166, 167 (La.App. 2 Cir.1966), persuasively held:
It is strenuously urged that the force of impact was so slight it could not have caused the injuries of the nature and extent complained of by the plaintiff, Ms. Seegers. This argument, in part is based upon the evidence and the record to reflect that the only damage to the rear of the Seegers' automobile was the breaking of the tail pipe bracket and a small dent in the rear bumper requiring a cost of repairs of only $448.88. While it is indisputable true that the impact as slight, we think it would be dangerous precedent to attempt to measure the degree of injuries in direct proportion to the force of the collision. The testimony of both the medical expert and the lay witnesses established the fact that Ms. Seegers did sustain some injuries and the minimal force of the collision is, therefore, of no material importance.
In the present case, there is not even a slight indication by the medical and lay witnesses that Davis' feigned her cervical and back injuries following the accident. The emergency physician's report indicates positive findings of cervical tenderness indicative of a severe cervical strain. Davis' temporary lapse of memory or judgment in failing to fully disclose her medical history to Dr. Reyes is of no real moment in light of the Dr. Reyes' testimony and Davis' medical records which clearly establish Davis' injuries resulted from the accident. Dr. Neupert, Allstate's medical expert, argued initially that Davis' injuries could have resulted from the accident. His amended report was based solely on Quick & Associates' conclusions which we find highly suspect and legally unreliable. The trial court committed manifest error in failing to award Davis damages for her injuries. After carefully examining the medical testimony, we award Davis general damages in the amount of $20,000 and past medical expenses in the amount of $3,510.53.

DECREE
For the foregoing reasons, the judgment of the trial court is reversed and rendered. Costs of this appeal are assessed against defendants-appellees.
REVERSED AND RENDERED.
AMY, J. dissents and would affirm the judgment of the trial court in full.
NOTES
[1] Dr. Pearce's complete evaluation determined Davis had (1) a displaced disc of the right TMJ, (2) a left TMJ capsulitis causing arthralgia, (3) Myofascial pain in the associated muscles of mastication mainly on the left side of her face and head and right posterior temporalis musculature and left side myofascial pain on the left cervical paraspinal musculature, (4) bilateral coronoid tendonitis, (5) parafunctional activity such as bruxism resulting in increased hyperactivity, (6) A Class 1, dental malocculsion caused by malopposed teeth which can be traumatic to chewing, and (7) areas of recurrent decay and two lower impacted third molars.