MRS. KAREN GRANGER AND MR. MILTON GRANGER
v.
DR. CAROL RIDENOUR, WOMAN'S HOSPITAL.
No. 2009 CA 0028.
Court of Appeals of Louisiana, First Circuit.
July 22, 2009.
Not Designated for Publication
EDWARD A. ROBINSON, III, MARK EDWARD ROBINSON, Counsel for Plaintiffs-Appellants Karen and Milton Granger.
HERBERT J. MANG, JR., TARA S. BOURGEOIS, ERIC E. HELM, LAUREN E. BYRD, Counsel for Defendant-Appellee Carol R. Ridenour.
PETER T. DAZZIO, CALLI M. BOUDREAUX, Counsel for Defendants-Appellees Woman's Hospital and Sandra Diane Bueche.
Before: KUHN, GUIDRY, and GAIDRY, JJ.
KUHN, J.
Plaintiffs-appellants, Karen and Milton Granger, appeal a judgment on a jury verdict, dismissing their medical malpractice claims against defendants, Carol Ridenour, M.D., an obstetrician/gynecologist (OB/GYN); Woman's Hospital; and Sandra Bueche, a respiratory therapist (RT). The Grangers also appeal the trial court's denial of their motion for judgment notwithstanding the verdict (JNOV) or for a new trial. We affirm.
On appeal, the Grangers contend the trial court erred in failing to grant their post-verdict motions. They urge, first, that the evidence outweighed the verdict; and secondly, that the jury clearly acted improperly such that impartial justice was not accomplished.
The Grangers maintain that because their experts' medical testimony represented independent opinions while defendants' expert testimony came from experts who had professional relationships with defendants, the evidence they presented outweighed the verdict the jury returned in favor of the defendants. Initially, we note that the Grangers did not request a hearing to challenge the expertise of any of defendants' expert witnesses. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and State v. Foret, 628 So.2d 1116 (La. 1993). Indeed, all of defendants' witnesses were admitted to testify in their respective fields of expertise without any objection from the Grangers.
The Grangers' expert testimony included that of Dr. Jonathan Murakas, accepted by the court as an expert in the field of neonatology and perinatal medicine. Dr. Murakas opined that when the Grangers' third child, Jamie, was born, he was not properly intubated by RT Bueche because upon the arrival of the neonatologist, Dr. Steven Spedale, the baby had to be reintubated. But Dr. Murakas admitted he was not willing to testify that RT Bueche had breached the standard of care. Registered nurse (RN) Betty McNair, admitted as an expert in the field of labor and delivery, nursing, and neonatal resuscitation, testified that it was her opinion that Jamie had not been properly intubated. RN McNair also used as a basis for her opinion the lack of any written notation in the delivery record of an assessment of the intubation subsequent to the original intubation. Likewise, Dr. Frederick Gonzales, an expert OB/GYN with a subspecialty in maternal fetal medicine, was of the opinion that the baby was never properly intubated. Also presented to the jury was the affidavit of Dr. Harvey Gabert, a board-certified, licensed OB/GYN who served on the medical review panel but was unavailable to testify at trial. Although in 1997 he agreed with the other panel members that there was no breach in the standard of care by any of the defendants, in February 2006, Dr. Gabert "recognize [d] that he and probably his fellow panel members inadvertently overlooked the fact that the medical records do indicate that the Granger baby was improperly intubated." Thus, the jury was provided evidence from which it could have concluded that RT Bueche and her employer, Woman's Hospital, breached the standard of care.
The jury was also presented with the expert testimony of the defendants' witnesses. Dr. Randall Brown, an expert OB/GYN who served on the medical review panel, stated that he continued to maintain his opinion that there was no breach in the standard of care by any of the defendants, including RT Bueche and Woman's Hospital. Reviewing the x-ray taken of Jamie upon admission into the neonatal intensive care unit (NICU), Dr. Brown stated that if the baby had been improperly intubated there would have been "tons of air" visible in the stomach. Based on the original notation indicating that harsh bilateral breath sounds had been heard and the lack of air in the stomach demonstrated by the x-ray, along with a lack of other objective findings, Dr. Brown opined that there had been no breach in the standard of care by the RT or the hospital. Dr. Michael Schexnayder, admitted as an expert OB/GYN, also served on the medical review panel. Like Dr. Brown, he maintained his original conclusion that there was no breach in the standard of care by any of the defendants. According to Dr. Schexnayder, the continuous chest compressions on Jamie's chest, as well as the disconnecting and reconnecting of the bag to the tube to administer medications in attempts to obtain a heartbeat, could have caused the tube to become dislocated. Because the x-ray did not show even a small amount of air in Jamie's stomach, Dr. Schexnayder maintained his opinion that the baby had not been improperly intubated for over seven minutes. He explained to the jury that the baby's problem was the underlying non-immune hydrops,[1] which was prenatal in origin.
Fact witness Jimmy Bennett, an RT who assisted RT Bueche on the code team that was present upon Jamie's delivery, also testified before the jury. According to Bennett, he was certain that the baby had been properly intubated. Besides the notation in the medical record of harsh bilateral breathing sounds by Jamie, RT Bennett recalled having seen condensation in the tube, which showed that the tube was properly inserted through the trachea. According to RT Bennett, the team was constantly assessing the baby's condition. He explained that, in practice, not every assessment is written into the record; only significant changes are noted. Responding to an inquiry as to why Dr. Spedale found the tube in the esophagus rather than the trachea, RT Bennett explained that it was possible the tube had been moved shortly before Dr. Spedale arrived at the NICU.
In determining whether to grant the JNOV, the trial court was not permitted to evaluate the credibility of the witnesses, and was required to resolve all reasonable inferences or factual questions in favor of the defendants. In light of the ample evidence opposing the motion which was of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, this portion of the motion was correctly denied. See Davis v. Wal-Mart Stores, Inc., XXXX-XXXX, p. 4 (La. 11/28/00), 774 So.2d 84, 89.
Turning now to the expert testimony the Grangers presented to support their claim that Dr. Ridenour breached the standard of care, we note Dr. Gonzales testified that hydrops was readily diagnosed with an ultrasound test. He opined that if a proper diagnosis had been made prior to Mrs. Granger's admission to the hospital to deliver her baby, a cesarean section delivery could have been planned with a team of expert neonatologists present to resuscitate the baby immediately. Dr. Gonzales suggested that during her 38th week of pregnancy, Mrs. Granger's weight gain of over forty pounds, her low hematocrit reading (28), and her edema were conditions that should have alerted an OB/GYN of the need to administer an ultrasound. According to Dr. Gonzales, Dr. Ridenour's failure to perform an ultrasound and plan for a cesarean delivery of Jamie were breaches in the standard of care. Thus, the jury could have relied on Dr. Gonzales's testimony to conclude that Dr. Ridenour breached the standard of care in her treatment of Mrs. Granger and Jamie.
The jury also heard the testimony from experts for Dr. Ridenour. Drs. Brown and Schexnayder concluded that Dr. Ridenour had not breached the standard of care in her treatment of Mrs. Granger. Although neither doctor worked with Dr. Ridenour at the time they served on the medical review panel, the jury was advised that at the time of trial both doctors were employed by Dr. Ridenour's employer, Louisiana Women's Healthcare Associates. Noting that an ultrasound had been performed at 28 weeks, both doctors agreed that nothing in the medical record indicated a need for an ultrasound prior to delivery. Dr. Jane Peek, admitted as an expert OB/GYN, did not have an employment association with Dr. Ridenour, although told the jury that they occasionally saw one another in the operating rooms or the halls of Woman's Hospital. Dr. Peek likewise agreed that based on all the information she had, including the medical record and deposition testimony, she saw no indication for an ultrasound on Mrs. Granger during her 38th week of pregnancy. Dr. Peek found nothing to indicate that Dr. Ridenour failed to appropriately treat Mrs. Granger and Jamie.
Accordingly, from our review the record contains sufficient evidence opposing the motion for JNOV which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions. Therefore, the evidence did not outweigh the verdict as the Grangers allege, and the trial court correctly denied this portion of the motion. See Davis, XXXX-XXXX at p. 4, 774 So.2d at 89.
The Grangers lastly assert that the jury acted improperly such that impartial justice was not accomplished. They urge that the trial court erred in denying both the motions for JNOV and for new trial.
Toward the end of the six-day trial, the Grangers sought to have juror #1 disqualified and replaced with the alternate. Out of the presence of the rest of the jury, the trial judge indicated that he had been advised that juror #1 had telephoned the bailiff. To address the issue, juror #1 was sworn and her testimony was adduced. She testified:
Yesterday when I left the parking garage I turned on this first street.... There was a big white Suburban with the [plaintiffs'] attorney in it and the gentleman in the black shirt with gray hair was parked on that side street. ... He got out of the car, came up to the Suburban and was talking to [plaintiffs' attorney]. ... As soon as they moved out of the way, I turned the corner to go back that way and the other attorney was just getting in his car. So as I drove home, I thought, that's kind of unusual, you know. We're supposed to not talk about this or anything and I wonder if that makes a difference. So I called [the bailiff] and told him what I had seen just in case. I may be completely wrong, but I just felt like in my gut that I should say something.
Insofar as her comments to the bailiff, juror #1 stated:
I just said that they were discussing something in the middle of the street. ... I told him I was not sure if that was [a witness] or not, but he had been in the courtroom all day yesterday and then he disappeared about the same time we were leaving.
When asked by the trial judge whether she had discussed the matter with any other person, juror #1 denied having done so, expressly stating that she "didn't say a word" to any of the other jurors or to anyone in her household.
During the examination of juror #1 by the Grangers' attorney, Edward Robinson, she expressly denied that her concern had anything to do with the fact that the man Mr. Robinson spoke with was white. After having been advised that the person she perceived was a witness was in fact an investigator with Mr. Robinson's office for over 20 years, juror #1 stated that she had no problem with the investigator working with Mr. Robinson. She denied that she had seen any of the attorneys for defendants talking to people she thought could be witnesses. Juror #1 testified that if she saw an attorney talking with a witness and the trial judge told her it was appropriate, she "would say perfect." According to juror #1, she "most certainly" could give a fair trial to all parties, including the Grangers, Woman's Hospital, Dr. Ridenour, and RT Bueche, reiterating that if the trial judge "says it was fine, then that's off my mind and that won't even enter it again."
At the close of evidence, the trial court noted that juror #1 testified that she would be able to apply the law in question and denied the Grangers' request to have her removed from the jury.
At the hearing on the Grangers' motions for JNOV and new trial, on the issue of whether the jury acted improperly such that impartial justice was not accomplished, over defendants' objection, the trial court permitted the introduction of the affidavit of Rev. Robert Joseph, who also served on the jury alongside juror #1. According to the attestations of Rev. Joseph:
[H]e personally observed and witnessed [juror #1] on [the same day she had been questioned by the court] tell members of the jury panel before [t]he jury deliberated on several occasions that she had some very important information to share but she could not share it until the case was over. ...
It appeared to him that the manner in which [juror #1] called attention to herself and to the information she wanted to share with the jury members was most improper. ...
Prior to the jury's deliberations several jurors pressed [juror #1] for the content of her so called important information but this affiant did not hear her speak about the matter until after the jury deliberations were completed. ...
After the jury deliberations were completed [juror #1] personally told the rest of the jurors in the jury room after leaving the courtroom that she had seen what she thought was improper contact by plaintiffs' counsel with a person she thought was a witness who spoke to the plaintiffs' attorneys in a big white Suburban SUV.
In denying the Grangers' relief on their post-verdict motions, the trial court concluded that the complained-of conduct "is not of such an egregious nature as to have precluded the impartial consideration of the evidence by the jury as a whole." On review, we find no abuse of discretion by the trial court. See Brown v. Hudson, 96-2087, pp. 4-8 (La. App. 1st Cir. 9/19/97), 700 So.2d 932, 935-37, cert denied, 524 U.S. 916, 118 S.Ct. 2297, 141 L.Ed.2d 157 (1998).
Accordingly, the trial court's judgments incorporating the jury's verdict and denying the post-verdict motions are affirmed by this memorandum opinion issued in compliance with La. U.R.C.A. Rule 2-16.IB. Appeal costs are assessed against plaintiffs-appellants, Karen and Milton Granger.
AFFIRMED.
NOTES
[1] The record establishes that hydrops is a condition in the fetus characterized by an accumulation of fluid, or edema, from which heart failure follows.