NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

23-24

STATE OF LOUISIANA

VERSUS

DONIVYN SCOTT CORMIER

**********

APPEAL FROM THE
THIRTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF CAMERON, NO. 168496
HONORABLE PENELOPE QUINN RICHARD, DISTRICT JUDGE

**********

CANDYCE G. PERRET
JUDGE

**********

Court composed of Candyce G. Perret, Charles G. Fitzgerald, and Guy E. Bradberry, Judges.

CONVICTION AND SENTENCE AFFIRMED;
FINANCIAL OBLIGATIONS VACATED AND REMANDED FOR
COMPLIANCE WITH LA.CODE CRIM.P. ART. 875.1.

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**Post Office Box 1641**
**Lake Charles, LA   70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Donivyn Scott Cormier**

**Winfred Thomas Barrett, III**
**District Attorney**
**Post Office Box 280**
**Cameron, LA   70631**
**(337) 775-5713**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**PERRET, Judge.**

Defendant, Donivyn Scott Cormier, was convicted by a jury of one count of sexual battery, a violation of La.R.S. 14:43.1, against his ten-year-old cousin, K.K.W.[1] Defendant was subsequently sentenced to thirty years at hard labor with five years suspended in lieu of three years of supervised probation; the remaining twenty-five years to be served without benefit of probation, parole, or suspension of sentence. Defendant appeals his conviction, asserting two assignments of error: (1) the trial court erred in admitting into evidence the opinion testimony of the State's expert witness that she believed the victim was being truthful, and in subsequently denying Defendant's motion for mistrial based on the alleged prejudice caused by this testimony; and (2) the trial court erred in denying Defendant's for cause challenge of a juror after Defendant had exhausted his peremptory challenges. For the following reasons, Defendant's conviction and sentence are affirmed.

**FACTS AND PROCEDURAL HISTORY:**

In April 2019, K.K.W. reported to her mother, Rebecca Driggs, that she had been molested by Defendant in the fall of 2018 during a sleepover at her Aunt Mechelle's house in Cameron Parish. Her aunt, Mechelle Driggs, is Defendant's biological mother with whom he was residing at the time. K.K.W. disclosed that Defendant, her brother Shelton, and herself slept in a tent at her aunt's house. After Shelton went to sleep, Defendant put his hand in her pants, touching her vagina. K.K.W. would later disclose that Defendant also inserted his penis into her vagina.

---

[1] As the victim in this case is both a minor and the victim of a sex offense, the victim's initials have been used in lieu of her name in accordance with La.R.S. 46:1844(W).

The following morning, K.K.W. asked her mother to pick her up, despite the original plan being for the siblings to remain with their aunt for several days.

After informing her mother of the offense, K.K.W. and her mother made reports with both law enforcement in the county where they resided and in Cameron Parish. K.K.W. was also interviewed by the Child Advocacy Center ("CAC") twice: once when the initial report was made, and a second time when K.K.W. came forward with more details of the offense.

On October 8, 2019, Defendant was charged by bill of information with one count of molestation of a juvenile, a violation of La.R.S. 14:81.2. An amended bill of information was filed on January 4, 2022, charging Defendant with one count of sexual battery, a violation of La.R.S. 14:43.1.[2] Defendant proceeded to trial on July 18, 2022.

At trial, the State's first witness was Rebecca Driggs, K.K.W.'s mother and Defendant's maternal aunt. Ms. Driggs testified that her sister, Mechelle, signed her parental rights regarding Defendant over to the state when Defendant was young. She testified that after that, the family had no contact with Defendant for over a decade, noting Defendant contacted his mother when he was seventeen. According to Ms. Driggs, K.K.W. and her older brother, Shelton, were always close to their Aunt Mechelle and always enjoyed the opportunity to spend time with her; however, after the incident in question, K.K.W. did not want to go back to her aunt's home.

---

[2] Defendant went to trial in the instant case on a charge of sexual battery; however, Defendant was also charged under a separate trial court docket number with one count of aggravated crimes against nature. Prior to the conclusion of trial, the trial court noted the State had conceded aggravated crimes against nature was not applicable and the charge was dismissed; thus, only the charge of sexual battery was ultimately presented to the jury.

2

Ms. Driggs testified that on April 12, 2019, K.K.W. disclosed for the first time what had happened when she and Shelton spent the night at their aunt's the previous fall. She stated K.K.W. told her Defendant had taken her shirt off and put his hand in her pants to touch her vagina despite her repeatedly telling him to stop; when he did stop, he told her he would make sure she got in trouble if she told anyone. Ms. Driggs recalled K.K.W. crying so much that it was difficult to understand her at times. Ms. Driggs testified she immediately contacted law enforcement in the county where she resided in Texas before contacting the Cameron Parish Sheriff's Office, all on April 12, 2019. On April 17, 2019, K.K.W. was interviewed in Lake Charles. Ms. Driggs noted that K.K.W. gave a second interview in May of 2022, when she was thirteen, because she had not disclosed everything that happened in the first interview.

Ms. Driggs testified that, although she knew Defendant was going to be at Mechelle's home when Shelton and K.K.W. spent the night in the fall of 2018, she had no idea that Defendant had previously been accused of molesting his foster sister. She noted K.K.W. and Shelton were supposed to spend the weekend with her sister; however, K.K.W. called her the morning after the first night and asked to go home. Ms. Driggs stated K.K.W. did not tell her why she wanted to go home. She stated she was not aware when she dropped the kids off that they would be sleeping together in a tent outside. According to Ms. Driggs, K.K.W. began isolating herself from other people after the trip to her aunt's and would often not eat. When asked if K.K.W. had any reason to make up a story about Defendant, Ms. Driggs described K.K.W. as her "Honest Abe child."

On cross-examination, Ms. Driggs testified she and her sister were not as close as they once were. Ms. Driggs reiterated her belief that Defendant was four or five

3

when Mechelle signed over her parental rights but acknowledged she was not living in the state at the time and did not know the circumstances under which it happened. She did not recall anyone ever contacting her to see if she would allow Defendant to live with her.

Ms. Driggs stated that the first time she saw Defendant since his mother gave up her parental rights was in early 2018. Although she acknowledged bringing Mechelle to visit Defendant in jail at one point, she testified that Mechelle would not tell her why Defendant was in jail beyond "it's complicated." Ms. Driggs testified that after Defendant came back into the picture, Shelton had spent the night with him and that the two of them had also spent the night with Mechelle's three other children, who live with their father.

The State then called Shelton Driggs, K.K.W.'s older brother. According to Shelton, he had spent nights with his Aunt Mechelle before the night of the incident, but the incident was the first time he had stayed with her while Defendant was present. Aside from knowing each other when they were toddlers, Shelton testified he and Defendant had only known each other a few months before the incident. He noted that, the weekend of the incident, he and K.K.W. were supposed to spend three or four days with their aunt; however, they left after the first night because K.K.W. wanted to leave, without any explanation.

Shelton did not remember what he, K.K.W., and Defendant did the afternoon he and K.K.W. arrived but the three of them planned on sleeping in a tent. According to Shelton, he and Defendant played video games that night until Shelton got tired and went to sleep. Shelton testified he went to sleep after midnight but that Defendant kept playing video games. Although Shelton stated he believed K.K.W. was sleeping between him and Defendant, he acknowledged being unsure. Shelton

testified that at the time of the incident, he was unaware that Defendant had been in jail.

On cross-examination, Shelton stated that, prior to the incident, he had spent the night with Defendant before; however, K.K.W. was not there. Shelton was unable to recall many of the details of the day of the incident, such as where they met with Mechelle, when they arrived, and what they ate. Shelton recalled K.K.W. being in the tent with them the whole night but was unsure what she was doing while he and Defendant were playing video games. Shelton testified that after the incident, K.K.W. would isolate herself from him and their mother.

The State then called Detective Tammy Gaspard, a twenty-five-year veteran of the Cameron Parish Sheriff's Office with a decade of experience as a detective. Detective Gaspard confirmed the investigation of the incident began on April 12, 2019, with a complaint filed by Ms. Driggs. She testified that she scheduled the initial interview for K.K.W. at the CAC on April 17, 2019, and that a second interview occurred on May 12, 2022. Detective Gaspard noted no physical evidence was recovered in the case due to delayed disclosure and the fact Defendant and his mother had already moved when the crime was reported. Detective Gaspard testified that she has worked somewhere between ten and twenty cases involving sex offenses with child victims and "[a]lmost none of them reported immediately."

The State's next witness was Ms. Patra Minnix, a child forensic interviewer and the director of the CAC. Ms. Minnix stated she had testified a handful of times in court but had never been qualified as an expert witness. Nonetheless, she was accepted as an expert in child forensic interviewing without objection. Ms. Minnix testified that she conducted the May 12, 2022 interview, the second interview, with K.K.W. She testified it was not unusual for a child victim to take time to disclose

5

an incident, and noted that the eight-month delay before K.K.W. reported what happened was normal. Additionally, Ms. Minnix testified that children often only disclose part of what happened to them when they initially report, and may disclose more or everything later when they feel safe. The State then published the video of K.K.W.'s May 12, 2022 interview.

*May 12, 2022 Interview*

K.K.W. begins by stating she does not know the exact date the incident took place; however, she knows she was ten years old when it happened. According to K.K.W., the purpose of the trip was to spend time with her aunt, and she did not even know Defendant would be present until they were driving to her aunt's. She described Defendant as "very touchy, feely" when she first arrived. She further clarified that when Defendant picked her up and gave her a hug, his hand was groping her butt. She stated they set up the tent outside around 6:00 or 7:00 p.m., the boys started playing video games around 8:00 p.m., and they played for a few hours.

According to K.K.W., Defendant was between her and Shelton and continued playing video games for about thirty minutes to an hour after Shelton went to bed. K.K.W. stated that, prior to her brother falling asleep, Defendant gave her a massage that started with him massaging her shoulders then moving his hands up and down her sides. K.K.W. stated that when Defendant laid down and closed his eyes, she got off her phone and laid down with her back to him, at which point he pulled her toward him and turned her on her back before whispering to her something regarding "starting a family," although she was unable to make out everything he said.

She described Defendant turning her so that they were chest-to-chest, taking her shirt off, and pulling one of her legs over his own. K.K.W. stated Defendant put

6

his hand down her pants while she was in this position, then he turned her over so that her back was to him, at which point he pulled her pants and panties down to about her mid-thigh. At that point, Defendant took his own pants off and put part of his penis inside her, although she could not say how long it lasted.

After he stopped, K.K.W. stated that she sat up and stared at Defendant, who tried to hug her and told her he was "sorry." She then laid back down and spent the next hour or two trying to fall asleep. K.K.W. clarified that while Defendant's hand was inside her pants, she could feel him touching her inside her vagina.

On cross-examination, Ms. Minnix confirmed the individuals at the CAC did not make any determinations as to whether a child was abused; they are there to document the child's experience. She testified that she knew at the time of the interview that K.K.W. had given a prior statement but that she had not seen it before the May 12, 2022 interview. She explained that the CAC does not keep evidence, but instead turns over the interviews to the referring agency. She also explained that, generally, subsequent interviews are usually performed by the same interviewer. However, in the instant case, the original interviewer of K.K.W. was no longer at the center.

It was at this point in the trial that Ms. Minnix opined regarding K.K.W.'s truthfulness. No objections to the testimony were made at this time. The following morning, the trial court, sua sponte, recognized that such opinion testimony was not proper under the Code of Evidence and instructed the jury to disregard Ms. Minnix's opinion on the truthfulness of K.K.W's interview. The jury was removed, and the State objected to the instruction, and defense counsel moved for a mistrial. As this motion is part of Defendant's Assignment of Error Number One on appeal, Ms. Minnix's testimony as well as the colloquy between counsel and the court will be

7

discussed in detail below. Ultimately, the trial court overruled the State's objection and denied defense's motion. The trial then continued.

The State called Ms. Shannon Cormier, Defendant's adopted sister.[3] She testified that Defendant left the Cormier home when she was twelve years old, stating he left because he molested her. She clarified that she meant Defendant had "penetrated her," saying he either touched her sexually "or had sexual intercourse with [her] without [her] permission." According to Shannon, the intercourse began when she was eleven or twelve, but that Defendant had been touching her her entire life. She also testified that Defendant had penetrated her both vaginally and orally with his penis. Although the Cormiers had cameras in the house hallways, Shannon testified that the wires were cut, and the footage disappeared when she made her allegations. Shannon testified she did not know K.K.W. and had never met her.

Shannon acknowledged having another adopted brother, Christian, who lived with the Cormier family at the same time as Defendant. She stated Christian was younger than Defendant and that she was closer to Defendant because Christian was sent to a group home repeatedly. Although Shannon acknowledged that Christian did set Defendant's bed on fire while Defendant was in it, she testified Defendant had "set him up" multiple times so that Christian would be sent away, including that Defendant had put tacks in his own drink and claimed Christian did it. Shannon also testified that while Christian was sent out of the home for hiding knives, Defendant was actually doing it and she testified Defendant even tried to get her to help him. Shannon believed Christian set Defendant's bed on fire because he knew Defendant had molested her.

_____

[3] The court notes that Shannon described Defendant as her adopted stepbrother; however, they were adopted by the same parents, thus we will simply refer to them as adopted siblings.

The State's next witness was Mrs. Erika Doshier, previously Erika Simon, via Zoom. Mrs. Doshier testified that she was previously employed by the CAC and had conducted the first interview with K.K.W at the CAC. Mrs. Doshier testified that she interviewed children in abuse-related incidents for sixteen-and-a-half years and had interviewed 1,767 children "as of September 24th of 2021." Mrs. Doshier agreed with Ms. Minnix that it is common for children to take time after being abused before they report the incident. Mrs. Doshier testified that it is also common for abused children to not disclose everything the first time they report abuse. The State then introduced the April 26, 2019 interview with K.K.W. conducted by Mrs. Doshier (then Erika Simon).

*April 26, 2019 interview*

During this interview, K.K.W. stated that when she and her brother stayed with her Aunt Mechelle, Defendant and Mechelle's boyfriend were both there. K.K.W. stated that she always likes to be around her brother, or she does not feel safe. She stated that when they were in the tent, her brother was closest to the opening, she was farthest away from the opening, and her cousin was in the middle, noting that she did not "like bugs or spiders or anything." She stated it was around September of 2018. She stated Defendant woke her up, touched her "in places [she] did not want to be touch[ed] in," and forcibly took her shirt off her.

K.K.W. stated that after Shelton went to sleep, she watched TV for a little bit before trying to go to sleep; however, Defendant would not let her sleep and was touching her. She clarified that Defendant was touching her "down below" underneath her clothing with his hand. She stated she could feel pain while Defendant was touching her. K.K.W. said that she told Defendant to stop, and he did; however, he then took her shirt off. She stated Defendant told her to take her

9

shirt off then removed it himself when she refused. According to K.K.W., Defendant did not say anything; he just stared at her; she was frozen in shock; and she did not speak either. K.K.W. stated that Defendant did not say much during the incident and neither did she.

K.K.W. stated that Defendant randomly stopped, told her he was sorry and asked if she would forgive him, to which she told him "no." He then let her go to sleep. K.K.W. then started crying and told Mrs. Doshier that she did not like talking about it. K.K.W. identified her vagina as the part of her body that was touched by Defendant on an anatomical drawing of a girl. She stated she was "super happy" to go home the next day because she did not want it to happen again. She stated she finally told her mother and brother because she was "tired of holding it all in."

The State, being satisfied with her testimony via the CAC videos, made K.K.W. available for cross-examination. K.K.W. testified that, prior to the incident with Defendant, she had been close with her Aunt Mechelle and that she typically saw her three or four times a year on holidays. According to K.K.W., the weekend of the incident was the first time she had spent the night at her aunt's camper, and she stayed because she wanted to spend time with Shelton, who wanted to hang out with Defendant. She stated she did not know how long Defendant and her brother had been friends nor did she remember the first time she met Defendant.

On the day of the incident, K.K.W. testified that her cousins, Hailey and Holli, were at her aunt's when she arrived, but they did not stay long. She also remembers her aunt having a boyfriend named Corey but stated he was not there at that time. She did not recall Shelton and Defendant leaving at any point or if there were any bikes at the residence. Although she did not recall where the tent came from, K.K.W. testified her brother and Defendant set up the tent in the afternoon.

10

After setting up the tent, K.K.W. testified that they set up her brother's TV and Playstation; they eventually brought blankets and pillows into the tent from in the camper. She testified she entered the tent, along with her brother and Defendant, around 7:00 p.m.; the boys were playing video games on the TV while she played games on her phone. Although K.K.W. testified that she went into the camper while it was light outside, she stayed in the tent all night once it got dark.

In response to defense counsel asking K.K.W. about differences in her two interviews, she responded that she simply did not want to tell the interviewer everything the first time she was interviewed, noting that she was scared and having to speak with multiple people she had never met before about what happened. She acknowledged she may have been mistaken when she said her Aunt Mechelle's boyfriend Corey was not there on the day of the incident but stated he was not there for long. The State then rested its case-in-chief.

Defendant's case-in-chief consisted of Defendant testifying on his own behalf. Defendant testified that when he was around two years old, he had keyed his mother's boyfriend's truck and was taken away from her by the State because the boyfriend had left bruises on him. Defendant described abuse that he suffered at the hands of a foster parent when he was between the ages of five and seven, that the individual had made him and other children do things to each other, that he made them give him oral sex, that he would hold their heads underwater until they passed out then rape them, and that he had anally and orally raped Defendant on multiple occasions.

According to Defendant, his future adopted brother Christian also spent some time in foster care with the same individual and was also abused. Defendant testified that after he was removed from that foster parent care, he went to another foster

11

home before he ended up with the Cormiers, along with Christian and Shannon. Defendant stated he did not disclose what happened while he was in foster care until the CAC brought him and Christian in for interviews because the abusive foster parent was a cop and threatened to kill him if he ever said anything.

Defendant testified that he and Christian got along well until a therapist brought up the issues with their prior foster parent, leading Christian to blame Defendant since he was older and did nothing to stop the abuse. Thereafter, he testified Christian tried to kill him multiple times, including setting Defendant's bed on fire while Defendant was in it. According to Defendant, the cameras in the Cormiers' home were set up in to monitor Christian and always functional. Defendant testified that when his sister Shannon accused him of molesting her, he was arrested at the age of seventeen and placed in the Jeff Davis Parish Jail before ultimately being moved to Concordia Parish and being placed in isolation for five to seven months. He testified the charges against him related to Shannon were dropped.

According to Defendant, he reconnected with his mother when he was seventeen and still living with the Cormiers, which upset them. He testified that after Shannon accused him of molesting her, the Cormiers dropped him off in Lake Arthur and told him to find his own way and that the police would be picking him up; he instead got his mother to pick him up. Defendant testified he went back to living with his mother and her boyfriend Corey after he was released from jail. He testified he first met his cousin Shelton at the mall after connecting with him through a friend. Defendant stated he and Shelton hung out repeatedly during the summer with Shelton spending the night on multiple occasions.

Defendant testified that in June of 2018, both Shelton and K.K.W. spent the night at the camper, along with Defendant's siblings Hailey, Holli, and Hayden.

According to Defendant, K.K.W. slept inside the camper to avoid bugs while the others all slept in the tent involved in the incident at issue. Defendant remembered Shelton spending the night in September, but not K.K.W.; while he remembered her being at the camper, he did not recall her spending the night, and definitely not in the tent. He testified he and his mother met K.K.W. and Shelton in Lake Charles a little after lunchtime and went shopping for food and drinks for the weekend visit.

Defendant then began claiming that in September only Shelton spent the night with him because Defendant, his mother, and her boyfriend Corey had picked Shelton up from his father's house, where Corey beat up Shelton's dad for abusing Shelton. According to Defendant, he remembered K.K.W. coming to the tent to speak with him and Shelton but leaving because they were ignoring her and playing video games. Defendant claimed that, aside from playing video games, he and Shelton were live on Instagram "for the longest." Defendant claimed K.K.W. was not in the tent when he and Shelton fell asleep at "approximately the same time" and that he only saw her the next day when her mother came to pick up Shelton. Defendant testified that his aunt, Ms. Driggs, knew why he had been in jail because Shelton had asked him about it, and he told Shelton he was falsely accused.

On cross-examination, Defendant acknowledged telling a Jeff Davis Parish Sheriff's Deputy that he, Christian, and Shannon "had a blast" during the Christmas 2016 holiday, despite this being the same time when Shannon alleged Defendant molested her, and Christian tried to kill Defendant by setting his bed on fire. Defendant again testified K.K.W. was not present on the night she said Defendant sexually abused her. Defendant then claimed K.K.W. was not in the tent that night because she had asked to go home before he and Shelton played video games until

13

the early hours of the morning. He claimed she wanted to go home because his mother told K.K.W. she could not sleep in the tent with Defendant and Shelton.

Defendant rested his case, at which time the State recalled Detective Gaspard on rebuttal. Detective Gaspard testified that during his interview on April 26, 2019, Defendant told her he, Shelton, and K.K.W. all slept in the tent, but that Defendant was the first one to fall asleep.

Following closing arguments, a unanimous jury found Defendant guilty as charged of sexual battery. On November 29, 2022, Defendant was sentenced to thirty years at hard labor with five years suspended in lieu of three years of supervised probation; the remaining twenty-five years are to be served without benefit of probation, parole, or suspension of sentence.

Defendant asserts two assignments of error on appeal: (1) the trial court erred in admitting the opinion testimony of the State's expert witness, Ms. Patra Minnix, that she believed the victim was being truthful into evidence, and in subsequently denying Defendant's motion for mistrial based on the alleged prejudice caused by this testimony; and (2) the trial court erred in denying Defendant's for cause challenge of Ms. Daphanne Creel after Defendant had exhausted his peremptory challenges. For the following reasons, Defendant's conviction and sentence are affirmed.

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find one error patent.

For Defendant's conviction of sexual battery of a victim under the age of thirteen, the court sentenced him to serve thirty years at hard labor. Twenty-five of

the thirty years were imposed without the benefit of probation, parole, or suspension of sentence, and the remainder of the sentence was suspended. Upon release, Defendant was placed on three years of supervised probation and ordered to pay $150.00 to the Department of Probation and Parole to help defray the cost of conducting the presentence investigation. Additionally, he was ordered to pay a $60.00 per month supervision fee and an $11.00 monthly technology fund fee.

Effective August 1, 2022, prior to Defendant's November 29, 2022 sentencing, La.Code Crim.P. art. 875.1 (emphasis added) requires the following, in pertinent part:

A. The purpose of imposing financial obligations on an offender who is convicted of a criminal offense is to hold the offender accountable for his action, to compensate victims for any actual pecuniary loss or costs incurred in connection with a criminal prosecution, to defray the cost of court operations, and to provide services to offenders and victims. These financial obligations should not create a barrier to the offender's successful rehabilitation and reentry into society. Financial obligations in excess of what an offender can reasonably pay undermine the primary purpose of the justice system which is to deter criminal behavior and encourage compliance with the law. Financial obligations that cause undue hardship on the offender should be waived, modified, or forgiven. Creating a payment plan for the offender that is based upon the ability to pay, results in financial obligations that the offender is able to comply with and often results in more money collected. Offenders who are consistent in their payments and in good faith try to fulfill their financial obligations should be rewarded for their efforts.

B. For purposes of this Article, "financial obligations" shall include any fine, fee, cost, restitution, or other monetary obligation authorized by this Code or by the Louisiana Revised Statutes of 1950 and imposed upon the defendant as part of a criminal sentence, incarceration, or as a condition of the defendant's release on probation or parole.

C. (1) Notwithstanding any provision of law to the contrary, **prior to ordering the imposition or enforcement of any financial obligations as defined by this Article, the court shall conduct a hearing to determine whether payment in full of the aggregate amount of all the financial obligations to be imposed upon the defendant would cause substantial financial hardship to the**

**defendant or his dependents.** The court may consider, among other factors, whether any victim of the crime has incurred a substantial financial hardship as a result of the criminal act or acts and whether the defendant is employed. The court may delay the hearing to determine substantial financial hardship for a period not to exceed ninety days, in order to permit either party to submit relevant evidence.

(2) The defendant or the court may waive the judicial determination of a substantial financial hardship required by the provisions of this Paragraph. **If the court waives the hearing on its own motion, the court shall provide reasons, entered upon the record, for its determination that the defendant is capable of paying the fines, fees, and penalties imposed without causing a substantial financial hardship.**

. . . .

G. The provisions of this Article shall apply only to defendants convicted of offenses classified as felonies under applicable law.

In this case, there is no indication that the court conducted a hearing or waived the judicial determination according to La.Code Crim.P. art. 875.1(C)(1) and (C)(2).

While this requirement is new, Paragraphs B and G of La.Code Crim.P. art. 875.1 make it clear that the article applies to *any* fine, fee, cost, restitution, or other monetary obligation imposed as part of a criminal sentence (principal) or as a condition of parole or probation in a felony case. The trial court "shall" conduct a hearing or waive the judicial determination of hardship with reasons provided prior to imposing a financial obligation.

In the present case, a monthly payment plan was established for the supervision fee ($60.00 per month) and the technology fund fee ($11.00 per month), and Defendant was ordered to pay, upon release, $150.00 to help defray the cost of conducting the presentence investigation. Accordingly, Defendant was put on notice of these conditions of his probation and is aware of what must be paid during his probation to avoid revocation. There is no "notice" issue presented in this case. However, there is still an issue of non-compliance with La.Code Crim.P. art. 875.1.

16

Thus, due to the noncompliance with La.Code Crim.P. art. 875.1, we vacate the financial obligations imposed on Defendant, and remand the case to the trial court for compliance with La.Code Crim.P. art. 875.1.

**ASSIGNMENT OF ERROR NUMBER ONE:**

In his first assignment of error, Defendant contends "[t]he trial court erred in denying [d]efense counsel's motion for mistrial, thereby admitting into evidence the opinion testimony of expert witness, Ms. Patra Minix [sic], that K.K.W. was being truthful." Defendant contends that Ms. Minnix's testimony that K.K.W. was being truthful in her interview was impermissible, citing *State v. Foret*, 628 So.2d 1116 (La.1993).

Defendant's express argument on this assignment of error is that the trial court should have granted his motion for mistrial. As such, an initial question must be addressed, namely, was Defendant entitled to a mistrial based upon testimony to which he did not object, on an issue he raised, when the trial court felt that an admonition to the jury was sufficient?

The denial of a motion for mistrial is reviewed for abuse of discretion on appeal. *State v. Ortiz*, 96-1609 (La. 10/21/97), 701 So.2d 922, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2352 (1998). The grounds for a mistrial are generally laid out in La.Code Crim.P. art. 775, in pertinent part:

> A mistrial may be ordered, and in a jury case the jury dismissed, when:
>
> . . . .
>
> (3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;
>
> . . . .

17

Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.

A mistrial shall be ordered, and in a jury case the jury dismissed, when the state and the defendant jointly move for a mistrial.

We note that La.Code Crim.P. art. 770 is inapplicable to the instant case because the comment in question came from a witness, not an officer of the court, but La.Code Crim.P. art. 771 may nonetheless be relevant:

In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:

. . . .

(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.

In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

The testimony at issue in this assignment was initiated by defense counsel as follows:

Q. Okay, and -- and we -- I guess, Mr. Barrett went over it, but over the years how many -- approximately about how many of these interviews have you done?

A. Over thirteen hundred.

Q. Okay. But again, like all y'all are is a -- y'all take down the information that -- that -- could y'all even testify as to whether you thought someone was being truthful or not?

A. Yes.

Q. Okay. Under what circumstances could you do that?

18

**A.** When I'm administered as an expert witness, I can.

**Q.** Okay. All right. So like in -- in this case -- well, without hearing the -- the -- if there are differences between the first statement and this statement, you know, how -- how do you feel about this case?

**A.** I was unable to watch the original interview.

**Q.** Okay. All right.

At that point, defense counsel announced that he had no further questions for Ms. Minnix. The State then questioned her about saying she could give an opinion regarding the truthfulness of a victim's statement, ultimately asking Ms. Minnix to "tell the jury [her] opinion about the truthfulness of [K.K.W.'s] statement." Ms. Minnix responded, "Yes. From the words that KKW was telling us, KKW's body language, and her descriptiveness of the abuse, it appears that KKW is telling the truth about what she experienced." No objection was raised, and the trial court subsequently recessed for the day.

The next day, the trial court opened by making the following statement to the jury:

> Good morning, everyone. I apologize for the delay in starting court this morning. We did meet in chambers. Yesterday Ms. Patra Minnix testified. She testified as an expert. And she testified as to the truthfulness of the victim's interview. That testimony is not proper under our Code of Evidence. So y'all should disregard that testimony.

> As I told y'all earlier and as I will instruct you at the end of the trial, you alone shall determine the weight and credibility of the witnesses of the evidence. You are the sole judges of the credibility of the truthfulness and the weight their testimony deserves. Okay?

The jury was then removed from the courtroom, and the State objected to the trial court's comments, noting Defendant had not objected to Ms. Minnix's testimony and that the entire re-direct examination was a response to defense counsel asking Ms. Minnix if and when she could give an opinion on whether a child was

19

being truthful. After the trial court overruled the objection, defense counsel requested a mistrial, contending Ms. Minnix's testimony "clearly crossed over the line of admissible evidence." Defense counsel also erroneously claimed they "did not ask that question." The trial court denied the motion for mistrial, "And I will deny your mistrial. I will note what Mr. Barrett did, that no objection was made at the time that the testimony was brought out. It was – that issue was brought up during your cross-examination. And I believe the Court's admonition to the jury is sufficient."

The testimony of Ms. Minnix that she believed K.K.W. was being truthful during her interview falls under La.Code Crim.P. art. 771(2). However, the trial court admonished the jury *sua sponte* when it told the jury to disregard Ms. Minnix's testimony because the jurors were "the sole judges of the credibility of the truthfulness and the weight" that should be given to witness testimony. Although Defendant moved for a mistrial after the court's admonition, it is clear the court felt the admonition was sufficient to relieve any potential prejudice.

This court has previously stated that "[w]hen the trial court is satisfied an admonition to the jury is sufficient to protect the defendant, that is the preferred remedy. 'A trial court's ruling denying a mistrial will not be disturbed absent an abuse of discretion.'" *State v. Winston*, 97-1183, p. 13 (La.App. 3 Cir. 12/9/98), 723 So.2d 506, 512 (citing *Ortiz*, 701 So.2d at 929), *writ denied*, 99-205 (La. 5/28/99), 743 So.2d 659. In the instant case, Defendant fails to provide this court with any argument as to why the trial court's admonition, coupled with jury instructions which clearly instructed the jury they were to determine whether they believed a witness was truthful, was insufficient to cure the possible prejudice Ms. Minnix's testimony might have otherwise invoked. Defendant's entire argument is that the

comment from Ms. Minnix was impermissible so Defendant should get a new trial; however, the fact the comment was impermissible is what makes it subject to La.Code Crim.P. art. 771. We cannot say the trial court abused its discretion in denying a mistrial and instead admonishing the jury to ignore the impermissible comment; furthermore, Defendant has failed to provide any argument to support a finding that the court did abuse its discretion.

Furthermore, the present issue is distinguishable from the issue presented in *Foret*, 628 So.2d 1116, relied on by Defendant. In *Foret*, the supreme court held that the trial court erred in allowing a child psychologist, who was accepted as an expert in the field of psychology with a focus on child sexual abuse, to testify that he believed the victim had been sexually abused based on his observations during interviews with the child. The victim's testimony in *Foret* was the only evidence of abuse, aside from the expert, Dr. Janzen, who testified that, after interviewing her, he believed the victim was sexually abused. Specifically, the state on direct asked Dr. Janzen if it was his "opinion that she was sexually abused?" *Id*. at 1120. The defendant simultaneously objected. The trial court permitted the question and Dr. Janzen summed up his testimony with "his 'only conclusion' was that the victim had 'been sexually abused.'" *Id*. Ultimately, the *Foret* court determined not only that Mr. Janzen's testimony was inadmissible, but also that its admission was reversible error. Neither party moved for a mistrial. The court concluded:

> [A]s there was error in the admission of the testimony, we must, before considering whether or not to reverse, determine whether or not it was harmless. La.C.Cr.P. art. 921 recognizes that not all errors require reversal, as it mandates that
>
> > (a) judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused.

21

. . . .

When considering the erroneous admission of evidence, this court has set out the test to be "whether there is a reasonable possibility that the evidence might have contributed to the verdict, and whether the reviewing court is prepared to state beyond a reasonable doubt that it did not." *State v. Walters*, 523 So.2d 811 (La.1988).

In this instance, the state's case was based largely upon the testimony of the victim. The inadmissible expert testimony served to unduly bolster this testimony and, in all probability, made it much more believable to the jury. Consequently, the jury probably gave the testimony of the victim more weight than it, standing alone, would have otherwise received. Given this effect of the expert's testimony, this court is not prepared to state that, beyond a reasonable doubt, the testimony of Dr. Janzen had no effect on the guilty verdict. Thus, the error is not harmless, and warrants reversal.

*Id*. at 1130-31.

As stated above, unlike *Foret*, Defendant raised the issue of whether Ms. Minnix believed K.K.W., Defendant did not object to the opinion testimony, and the trial court admonished the jury. The issue herein is whether Defendant is entitled to a mistrial based on these facts. We find this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER TWO:**

In his second assignment of error, Defendant contends "[t]he trial court abused its discretion when it denied [d]efense counsel's challenge for cause regarding Prospective Juror #13, Ms. Daphanne Creel, after counsel had exhausted all of his peremptory challenges." The supreme court has previously stated, "where all peremptory challenges have been used, as in this case, a defendant need only demonstrate the erroneous denial of a challenge for cause to establish reversible error warranting reversal of a conviction and sentence." *State v. Dotson*, 16-473, p. 4 (La. 10/18/17), 234 So.3d 34, 38, *writ denied*, 18-177 (La. 12/17/18), 259 So.3d 340. It is uncontested that Defendant used all twelve of his peremptory strikes in the instant

case.  As such, the question before this court is whether the trial court erred in denying Defendant's for cause challenge of Ms. Creel.

Ms. Creel was called up on the second day of voir dire and, although she initially said neither she nor anyone close had been a victim of a crime or accused of a crime, she clarified that she had been a victim and had been "violated," but that no charges had ever been pursued.  Ms. Creel stated she felt it would be difficult to be a juror because she was a young victim who had been assaulted more than once and she felt like society often tended to scrutinize the victims more than the perpetrators.  She also stated she found it hard to believe someone as young as ten would lie about abuse.

However, Ms. Creel subsequently stated that she would not want to convict someone based upon her own experiences but based upon the evidence.  When asked if she could vote based solely on the evidence presented, she stated she could do so and that she recognized sometimes things are not how they appear at first glance, so she could vote based upon the evidence presented.  She further clarified that while she felt that she could sympathize with the victim, that it would not affect her decision-making.  While being questioned privately, she reiterated that she would not allow emotion to affect her decisions.  Ms. Creel stated she believed people have been falsely accused of sexual assault and that children sometimes lie about sexual assault, so she would not make any emotional decisions as a juror.  Ms. Creel also stated that she had received counseling and was "in a good [sic] place than I was before with that[.]"  When asked if she would want someone like herself on the jury if she was representing Defendant, she stated the following:

> I think so, because of this.  I want the truth to come out either for the defendant or the victim, you know, however you say it.  If he's being falsely accused, then I want the truth for him to come out, and not --

and then, same thing with the victim. If she has been victimized, I want the truth. So based on that -- but they can't tell if I'm being honest or not, you know? But based on what I've said and told you, that I am being honest, yeah, I think it would be fine to pick me as a juror.

Defense counsel then challenged Ms. Creel for cause, stating his belief that "she made up her mind that she wanted to be on this jury and was going to say whatever she could to -- to make it sound like she was going to be a -- a fair juror." The trial court ultimately denied the challenge for cause, finding Ms. Creel rehabilitated and willing to decide the case based solely on the evidence presented.

Under La.Code Crim.P. art. 797(2), a juror may be challenged for cause if:

> The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence[.]

Defendant acknowledges in brief that:

> Jurisprudence reveals Louisiana appellate courts have repeatedly upheld the denial of challenges for cause of prospective jurors who have been the victims of crimes similar to the one for which a defendant stands accused, where the juror states he or she would be fair, impartial, and not prejudiced against the defendants. *See State v. Thomas*, 13-47 (La.App. 3 Cir. 11/06/13), 124 So.3d 633; *State v. Stovall*, 439 So.2d 618 (La.App. 1 Cir.1983); *State v. Williams*, 44,418 (La.App. 2 Cir. 6/24/09), 15 So.3d 348, *writ denied*, 09-1746 (La.3/26/10), 29 So.3d 1250.

In *Thomas*, 124 So.3d 633, referenced by Defendant, this court found that two potential jurors were not subject to challenges for cause in an aggravated rape case involving minors; one of the jurors had a sister who was a rape victim at around eleven years old, and the other juror was molested as a child and raped when she was seventeen. Much like Ms. Creel, the second juror in *Thomas* stated that while the trial might bring up old memories, she had been through counseling, would be

24

able to put aside her own experiences, and felt that if someone accused was innocent, they deserved to be found innocent.

Additionally, in *State v. Robinson*, 36,147 (La.App. 2 Cir. 12/11/02), 833 So.2d 1207, the second circuit found that a juror who disclosed having been a childhood rape victim and whose aunt had been raped and murdered, was not required to be removed for cause. Again, the potential juror, like Ms. Creel, testified she had been through counseling and believed she could separate her emotions from the evidence and judge the case on its merits, not her experiences.

Accordingly, we cannot say that the trial court erred in finding Ms. Creel was sufficiently rehabilitated given her statements that she had been in counseling for her past experiences and her statement that her emotions would not affect her ability to evaluate the evidence and be fair to both the victim and Defendant. Accordingly, this assignment of error lacks merit. As such, Defendant's conviction is affirmed.

**DECREE:**

Defendant's conviction and sentence are affirmed. However, the financial obligations imposed on Defendant are vacated and the case remanded to the trial court for compliance with La.Code Crim.P. art. 875.1 prior to any financial obligations being imposed.

**CONVICTION AND SENTENCE AFFIRMED; FINANCIAL OBLIGATIONS VACATED AND REMANDED FOR COMPLIANCE WITH LA.CODE CRIM.P. ART. 875.1.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.

25